**SAN ANTONIO RIVER AUTHORITY et al., Appellants,**

**v.**

**GARRETT BROTHERS, Appellee.**

No. 15343.

Court of Civil Appeals of Texas, San Antonio.

April 23, 1975.

Rehearing Denied Oct. 8, 1975.

Harvey L. Hardy, Ralph Brown, Jackson C. Hubbard, Asst. City Atty., San Antonio, for appellants.

Paul M. Green, Lang, Cross, Ladon, Boldrick & Green, San Antonio, for appellee.

CADENA, Justice.

This is an appeal by defendant governmental agencies, San Antonio River Authority (referred to in this opinion as "SARA") and the City of San Antonio (identified in this opinion as "City"), from a judgment based on a jury verdict, awarding plaintiff, Garrett Brothers, a partnership consisting of Charles E. Garrett and Thomas S. Garrett, III, recovery of actual and exemplary damages as a result of the action of City officials, allegedly acting in pursuance of a joint venture with SARA, in halting development of plaintiff's subdivision.

Plaintiff owns approximately 100 acres of land in Bexar County which it acquired for the purpose of subdividing into residential and commercial lots. After plaintiff had obtained appropriate zoning of the land, it submitted the plat and master plan of the proposed subdivision to City's planning Commission, as required by Articles 970a and 974a.[1]

For some time prior to the date on which plaintiff submitted its plat for approval, SARA, in conjunction with other governmental agencies, had been engaged in the execution of a watershed protection and flood control project which called for the erection of some 15 dams. According to the plans, one of the dam sites, referred to in the record as site 15, was to be located on the land which plaintiff was proposing to subdivide. There had been discussions between officials of SARA and City concern-

---

1. All statutory references, unless otherwise indicated, are to Tex.Rev.Civ.Stat.Ann.

ing this particular dam, since, in connection with the construction of the dam, it was proposed to create a reservoir or lake, and City intended to use the lake as a part of the recreational facilities in a City park which adjoined, or was near to, plaintiff's proposed subdivision. Because of the plans for construction of the dam and lake, consideration was given by City officials to rejection of the proposed plat and master plan in order to prevent development would increase the cost of acquisition of the land required for the project. However, City's legal department advised the planning officials that the fact that it was proposed to acquire plaintiff's land at some future date and that development of the land by plaintiff would increase the cost of such acquisition was not a valid reason for withholding approval of the plat. As a result, the Planning Commission, on August 11, 1971, approved the plat and master plan of the proposed subdivision.

Plaintiff then entered into contracts with various persons, including the municipally-owned utilities, for development of its property in accordance with the plat and master plan. After final engineering work was completed, equipment required for the construction of subdivision improvements, including the construction of street, the installation of sanitary sewers, and the laying of electric, gas and water lines, was moved onto the subdivision site, and construction of the streets called for by the approved plat was begun.

Meanwhile, discussions between SARA and City officials continued in connection with the construction of the proposed dam and lake. The purpose of these discussions was to achieve cooperation between SARA and City in the acquisition of the land required for the public improvement. One of the problems discussed was the increase in land acquisition costs which would result from plaintiff's development of the subdivision, and there was expressed concern that continued development of plaintiff's land might increase the value of such land to the extent that construction of the dam and

lake would become economically unfeasible. These discussions were had between administrative or executive officials of the two agencies, and there is no evidence to indicate that, prior to October 20, 1971, the attention of the governing body of either agency was directed to the site 15 project as presenting a special problem.

On October 20, 1971, SARA officials communicated their concern to SARA's governing body and recommended, for the purpose of accelerating acquisition of the required land, the execution of a cooperation agreement between SARA and City. On that date, SARA's governing body authorized the execution of the cooperation agreement.

On October 28, 1971, some members of City's governing body met in what the record discloses was an informal session. City's governing body consists of nine members, but the record does not disclose how many were present at this gathering, although the evidence does disclose the presence of three members. SARA's chief executive officer explained the entire watershed protection and flood control project, and stated that much of the land required for the proposed dams had been acquired by SARA. He then directed attention to the proposed site for dam 15 and the lake and, after pointing out that plaintiff had already begun development of the subdivision, urged that City enter into the cooperation agreement with SARA as soon as possible, since delay would mean that the price of the required land would increase as a result of plaintiff's development and there was a danger that, because of such enhancement in the value of the land, the entire project would "go out the window." City's chief executive officer also stressed the need for prompt action in order to prevent further development of plaintiff's land. At the conclusion of the discussion, a member of City's governing body instructed City's chief executive officer to "prepare whatever is necessary for this and let's go."

One week later, on November 4, 1971, City's governing body, meeting in formal

session, adopted an ordinance authorizing execution of the cooperation agreement on behalf of City.

On November 18, 1971, City's director of planning, in writing, informed various municipal departments and agencies, including the gas and electric and water utilities, of the proposed project and requested that the installation of utilities in the subdivision be discontinued. At the time he took this action, the director of planning knew that the city attorney had given an opinion to the effect that City had no authority to halt further development of plaintiff's subdivision merely because continued development would result in an increase in the cost of acquiring the land in the future.

As a result of the action of City's planning director, plaintiff was told to halt installation of utility lines in the subdivision, and City's director of public works refused to issue permits authorizing plaintiff to install sanitary sewers.

Plaintiff discontinued further development and sought information from SARA concerning the exact location of the proposed dam and reservoir. It was not until some time in December, 1971, that SARA officials were able to furnish this information to plaintiff. Plaintiff's engineers determined that the site chosen for the dam was not the best available site in the area, due to the contours of the land. Plaintiff made the decision of its engineers known to SARA and urged reconsideration of the decision establishing the location of the dam. A re-study of the project by SARA resulted in a modification of the plans for the project, including a relocation of the dam site. On May 22, 1971, SARA informed City officials of the modification and stated that, in view of the change in plans, the continued development of plaintiff's subdivision presented no problem. Plaintiff was then allowed to resume development, although the change in plans did require some modification of plaintiff's planned development.

Neither SARA nor City challenges the sufficiency of the evidence to support the jury's finding relating to actual damages suffered by plaintiff as a result of the interruption of plaintiff's development of its land.

SARA's brief contains 25 points of error, while City's brief contains 19 points. Some points are common to both briefs. City's points are grouped under various headings for the purpose of argument, and plaintiff's brief is substantially similar in organization. To a substantial degree, in discussing the points, we will adopt the same general format, although the points are not necessarily discussed in the order in which they are presented in the briefs.

## I.

### The Question of Liability

Under this heading we will consider City's contentions that it is not liable because (1) the acts of which plaintiff complains were *ultra vires* as far as City is concerned; (2) the acts of the various municipal officials were neither authorized nor ratified by the city council, City's governing body; (3) the acts of which plaintiff complains were performed in the exercise of a governmental function and, therefore, in no event can City be held liable for the injury suffered by plaintiff; and (4) plaintiff's suit cannot be maintained because plaintiff failed to give the written notice of his claim which is required by City's charter. Since SARA also invokes the doctrine of ultra vires, this point will be discussed first.

(1). *Ultra vires.* Sometimes, the term "ultra vires" is used in a broad sense including not only an act which is not within the power of a municipal corporation to perform, but also an act which is within the powers of the governmental agency but which is done by its officials or employees who were not authorized to engage in such conduct. See *City of Waco v. Thompson,* 127 S.W.2d 223 (Tex.Civ.App.—Waco 1939, writ dism'd jdgmt. cor.). This extended meaning of the term can only result in

confusing questions of governmental power with questions of an agent's authority. We will restrict use of the term to its strict and primary meaning, that is, an act which is beyond the power of a municipality to perform under any circumstances and for any purpose. 10 McQuillin, Municipal Corporations § 29.10, p. 250 (3d rev. ed. 1966).

Under Article 970a, § 4, and Article 974a, City has the power to control the subdivision of land within its corporate limits and within that area beyond the corporate limits which lies within City's "extraterritorial jurisdiction." This includes the power to control extensions of its water and sewer lines. Under Articles 1015a, 1109b, 1109c and 6081e, City has the right to acquire land, by condemnation or otherwise, for park and recreational purposes. The cooperation agreement between City and SARA is authorized by Article 4413(32c).

City has chosen to assume control and regulation of the development of subdivisions, including the installation of water and sewer lines, as authorized by statute. This control is exercised not only by giving or withholding of plats and master plans for proposed subdivisions, but also by issuing or refusing permits required for the installation of such lines and their connection to existing lines. Necessarily, City is obligated to permit development of subdivisions and to issue the required permits if the person desiring such development and applying for the necessary permits complies with applicable rules and regulations. Similarly, in the absence of such compliance by the developer, City is authorized to refuse to permit such development, including the installation of utility lines if such proposed development and installations do not comply with applicable regulations.

Under these circumstances, it cannot be said that the acts of which plaintiff complains were acts which City lacked the power to perform under any circumstances and for any purpose. The terms "ultra vires" and "illegal" are not synonymous. The two terms represent distinct ideas, just as do the terms "absence of power" and "abuse of power." While an act may be both ultra vires and illegal, it may be illegal without being ultra vires. To equate illegal conduct with the absence of power would completely immunize municipal corporations from liability in damages for an illegal act or wrongful exercise of existing power.

The harsh results flowing from the doctrine of ultra vires are manifest. There is no compelling reason for extending the doctrine to protect cities from liability for damage inflicted while acting within their general or specific powers. 1A Antieau, Municipal Corporation Law § 11.01 (1974).

City's defense of ultra vires must be rejected.

■ However, SARA's plea of ultra vires must be sustained. SARA's powers are enumerated in Article 8280–119. It is a special purpose governmental agency and does not possess the broad powers generally exercised by cities, towns, and villages. Specifically, SARA wholly lacks authority to regulate the development of subdivisions. It completely lacks control over the construction of streets, installation of water mains, installation of sanitary sewer lines or the issuance or withholding of permits to engage in such construction and installation. It has no control of the city-owned utilities. Even if it be assumed that City's actions in this case were engaged in at the request of SARA's executive officers, and ignore the fact that there is no evidence that SARA's governing body knew of, authorized, acquiesced in or ratified the acts of its executive and administrative personnel, the conclusion is inescapable that the conduct of SARA's executive officers was in relation to matters wholly beyond the ambit of SARA's powers. SARA wholly lacked the authority to interfere with plaintiff's development of the subdivision under any circumstances. The acts of which plaintiff complains could not have been undertaken by SARA for any purpose. There is, therefore, no basis for imposing liability on SARA.

In view of our holding that the judgment against SARA cannot stand, we will not consider any of the other points contained in SARA's brief, except insofar as the same points are relied on by City.

(2). *Authority of City officials.* By assuming control and regulation of subdivisions and of the installation of water and sanitary sewer mains, City became liable for the acts of its officers and employs to whom the day-to-day execution of such powers was delegated. Article V, § 61, of City's charter charges the department of public works, of which the director of public works is the chief administrator, with the duty of issuing plumbing permits. One of the duties of municipal officers, in exercising municipal powers, is to permit parties to develop their land, to permit the installation of water and sewer lines, and to permit such lines to be connected to existing lines if there has been compliance with applicable regulations and, in the absence of such compliance, to refuse to permit such development, installation and connection. It seems clear that if a municipal official or employee, charged with the duty of granting or withholding the required permission, wrongfully deprives a person of the right to develop his land, install water and sewer lines, and connect such lines to existing facilities, the action of the official or employee is within the course of his employment and within the scope of his duty and, therefore, City is liable for such wrongful act. *City of Ysleta v. Babbitt,* 8 Tex.Civ. App. 432, 28 S.W. 702, 703–04 (Tex.Civ.App. —San Antonio 1894, no writ). This follows from application of elementary rules of the doctrine of *respondeat superior.* Restatement, Agency 2d §§ 212 *et seq.* (1958); 3 Am.Jur.2d, Agency § 267 (1962).

(3). *The "governmental function" defense.* City insists that in regulating the development of land in general and particularly in refusing to issue permits it is exercising a governmental function and is, therefore, immune from liability. *Kirschke v. City of Houston,* 330 S.W.2d 629 (Tex. Civ.App.—Houston 1959, writ ref'd n. r. e.); Anno: 37 A.L.R.2d 694 (1954).

In order to dispose of this point we must consider the nature of plaintiff's complaint. Plaintiff alleged that the actions of City deprived it of the use and enjoyment of its property, albeit for a temporary period, and constituted a "taking" or "damaging" of its property for which, under the provisions of Article I, § 17 of the Texas Constitution, it was entitled to compensation. It is settled that the defense of governmental function is not available where the conduct of the municipality amounted to a taking or damaging within the constitutional prohibition. Article I, § 17, of the state constitution does not limit the requirement of payment of compensation to cases where the taking or damaging results from the exercise of "proprietary" functions. Every power of government is subordinate to the requirement that compensation be paid. *Stockwell v. State,* 110 Tex. 550, 221 S.W. 932 (1920); 18 McQuillin, op. cit. § 53.-24b, p. 182.

City contends that, under the *Kirschke* decision, even if it be assumed that its acts were illegal, the interference with plaintiff's use, enjoyment and development of its lands does not constitute a taking or damaging within the constitutional provision in question.

In *Kirschke,* plaintiff applied for a building permit. The permit was denied because "it appeared that [the] said property would be needed for highway purposes." 330 S.W.2d at 630. The court held that there had been no taking or damaging of plaintiff's property. Cases such as *State v. Hale,* 136 Tex. 29, 146 S.W.2d 731 (1941), where, in the process of constructing a public improvement, the governmental agency caused the flooding of plaintiff's land and the deposit of sand and other materials on such land, were distinguished by pointing out that in such cases the damage resulted from a physical invasion of the land as the result of the construction of a public improvement. Insofar as the distinction is

based on the presence or absence of a physical invasion, it is manifestly untenable. Despite the fact that the crazy-quilt pattern of judicial doctrine in this area has not yet yielded a principle upon which the cases can be rationalized, it is now universally recognized that acts short of actual physical invasion, appropriation or occupation can amount to a compensable taking, and that governmental restrictions on the use of property can be so burdensome as to constitute a compensable taking. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *Allen v. City of Corpus Christi,* 247 S.W.2d 130 (Tex.Civ. App.—San Antonio 1952), aff'd., 152 Tex. 137, 254 S.W.2d 759 (1953).

An unreasonable interference with the right of access to one's property is recognized as a compensable taking. *DuPuy v. City of Waco,* 396 S.W.2d 103 (Tex.1965). Our courts have adopted the view that interference with the right of access is not rendered uncompensable merely because the interference is temporary. *City of LaGrange v. Pieratt,* 142 Tex. 23, 175 S.W.2d 243 (1943); *Hart Bros. v. Dallas County,* 279 S.W. 1111 (Tex.Com.App.1926, jdgmt. adopted). No valid reason exists for holding that unreasonable interference with the right to use property should not be regarded as a compensable taking.

It is true that in cases such as *DuPuy* and *Pieratt,* the damage, permanent or temporary, resulted from the construction of a public improvement, while in the case before us, as in *Kirschke,* the governmental interference with the right of the landowner resulted from the fact that the construction of a public improvement was contemplated. While recognizing the validity of the dictum by Justice Holmes that "government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law," [2] we must not lose sight of the fact that by express constitutional provision government must pay in certain cases. The question before us is whether prohibitions on use of property which have as their purpose the prevention of private development that would increase the cost of planned future acquisition of such property by the government is the type of case in which payment of compensation is required.

The dismal picture which Mr. Justice Holmes painted with such broad strokes is but a version of the traditional police power-eminent domain dichotomy which lies at the root of the doctrine that compensation is not required to be made for losses occasioned by the proper exercise of the police power, but must be made for losses resulting from an exercise of the power of eminent domain. *City of San Antonio v. Pigeonhole Parking of Texas,* 158 Tex. 318, 311 S.W.2d 218 (1958).

The attempted distinction is, at best, illusory. If there is a taking the constitution requires payment, even though the taking be for the purpose of promoting the public health, safety, morals or welfare and, therefore, involves an exercise of the police power. *Brazos River Authority v. City of Graham,* 335 S.W.2d 247, 251 (Tex.Civ.App.— Fort Worth 1960), aff'd, 163 Tex. 167, 354 S.W.2d 99 (1961). The empty formalism of "police power" cannot be made the basis for denying compensation, and the Texas Supreme Court has expressly refused to "compartmentalize an exercise of sovereignty as either police power or eminent domain for the resolution of problems arising under Article I, Sec. 17, of the Constitution . . . ." *DuPuy v. City of Waco,* 396 S.W.2d at 107.

It is clear that in exercising the police power, the governmental agency is acting as an arbiter of disputes among groups and individuals for the purpose of resolving con-

---

**2.** *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922).

flicts among competing interests. This is the role in which government acts when it adopts zoning ordinances, enacts health measures, adopts building codes, abates nuisances, or adopts a host of other regulations. When government, in its role as neutral arbiter, adopts measures for the protection of the public health, safety, morals or welfare, and such regulations result in economic loss to a citizen, a rule shielding the agency from liability for such loss can be persuasively defended, since the threat of liability in such cases could well have the effect of deterring the adoption of measures necessary for the attainment of proper police power objectives, with the result that only completely safe, and probably ineffective, regulatory measures would be adopted. But where the purpose of the governmental action is the prevention of development of land that would increase the cost of a planned future acquisition of such land by government, the situation is patently different. Where government acts in this context, it can no longer pretend to be acting as a neutral arbiter. It is no longer an impartial weigher of the merits of competing interest among its citizens. Instead, it has placed a heavy governmental thumb on the scales to insure that in the forthcoming dispute between it and one, or more, of its citizens, the scales will tip in its own favor. The social desirability of leaving government free to seek its own enrichment at the expense of those whom it governs under the guise that it has the power to regulate harmful conduct is not readily apparent. See Sax, Takings and the Police Power, 74 Yale L.J. 36 (1964). To permit government, as a prospective purchaser of land, to give itself such an advantage is clearly inconsistent with the doctrine that the cost of community benefits should be distributed impartially among members of the community. The prohibition against uncompensated takings was "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960).

To hold a governmental agency liable under the facts of this case will not cause the heavens to fall, nor will it transform government into a giant shackled into inactivity by the fear of potential liability. It will still be free to enact zoning ordinances, building codes, health regulations, traffic laws, etc. In brief, it will still be able to "govern" without fear of financial disaster. The only result will be that it will not be able to "rig" the market in its favor. That is, government will merely be discouraged from giving itself, under the guise of governing, an economic advantage over those whom it is pretending to govern.

We decline to follow *Kirschke.* See, generally Van Alstyne, Taking or Damaging by Police Power: The Search for Inverse Condemnation Criteria, 44 So.La.L.Rev. 1 (1971); Beuscher & Wright, Cases and Materials on Land Use 722 (1969); Dunham, From Rural Enclosure to Reenclosure of Urban Land, 35 N.Y.U.L.Rev. 1238, 1253 *et seq.* (1960). Cf. Campbell, The Limited Access Highway—Some Aspects of Compensation, 8 Utah L.Rev. 12, 16–19 (1962); Clarke, The Limited Access Highway, 27 Wash.L.Rev. 111, 119–22 (1952); Comment, 14 Baylor L.Rev. 70 (1962).

■ In this case plaintiff recovered the expenses which it necessarily incurred as a result of the temporary interference with the development and use of its land. Where there has been a temporary taking or damaging, the landowner is entitled to recover such sum as would compensate for loss of profits and necessary expenditures. *Hart Bros. v. Dallas County, supra.*

■ (4). *Notice of Claim.* The charter provision requiring the giving of notice of a claim of injury is not applicable to a case of this nature. 40 Tex.Jur.2d, Municipal Corporations § 652 (1962).

City's points 1, 2, 11, and 12 are overruled.

## II.

### Points Relating to Charge

By its third point City complains of the refusal of the trial court to submit an issue inquiring whether the acts of City's officers, agents, servants or employees were the cause or the proximate cause of plaintiff's damages.

Special issue 7, relating to actual damages suffered by plaintiff, asked the jury to determine the sum of money which would reasonably compensate plaintiff for "damages proximately caused by the actions taken by the officers, agents, servants and employees" of City. The issue was accompanied by a definition of the term "proximate cause."

■ The fact that plaintiff had suffered loss was undisputed. Special issue 7, by its very terms, limited the jury's consideration to those losses "proximately caused" by City's actions. Particularly in view of the amendment to Rule 277, Tex.R.Civ.P. (1967), which became effective prior to the trial of this case, there was no error in submitting, in one issue, the two elements, proximate cause and damages, of plaintiff's cause of action. In any event, City does not object to the form of special issue 7.

City's point 3 is without merit.

By its fourth point City complains of the submission of special issue 5, on the ground that there was no evidence to support the submission of such issue. Point 5 asserts that the evidence is insufficient to support the jury's affirmative answer to such issue.

There is no evidence to suggest that City's governing body authorized the city manager and his staff to take such action as might be necessary to halt further development of plaintiff's land. The, evidence clearly establishes that the October 28, 1971, meeting was not a formal meeting of the city council. There is no showing that a quorum was present. No vote was taken. At best, the evidence establishes that one member of the governing body instructed the city manager to "prepare whatever is necessary," and that this instruction was, perhaps, tacitly acquiesced in by the two other members of the council who were shown to be present. The city council consists of 9 members, and City's charter provides that a majority of the members shall constitute a quorum and that, with certain exceptions not here applicable, measures can be adopted only by the affirmative vote of 5 members.

■ Individual members of a municipal governing body have no authority to bind the corporation by their actions. *City of San Antonio v. Guido Bros. Construction Co.*, 460 S.W.2d 155 (Tex.Civ.App.—Beaumont 1970, writ ref'd n. r. e.). There is no basis for holding that the councilmen who were present at the October 28, 1971, gathering were acting as a body in its official capacity.

Further, it is patent that the attention of the councilmen present at the unofficial session was directed to the execution of the cooperation agreement between City and SARA. The discussion was aimed at the desirability or necessity of entering into such agreement at the earliest possible moment. No mention was made of the possibility of imposing a "freeze" on development of plaintiff's land by administrative fiat or otherwise. No one mentioned the possibility of preventing further development prior to the acquisition of the land. In fact, the comment of the city manager was to the effect that if the city council authorized the execution of the agreement, the land would be acquired and development stopped. In this context, the instruction to "prepare whatever is necessary" is unmistakably referable to the preparation of whatever might be necessary to enable the city council to authorize execution, on behalf of City, of the agreement. An ordinance authorizing execution of such agreement was, in fact, the only thing "prepared," and this ordinance was presented to, and adopted by, the city council at a formal meeting, following a vote of the council members, one week later.

However, the lack of evidence to show that the course of conduct engaged in by City officials was not expressly authorized by the city council does not relieve City of liability for the actual damages suffered by plaintiff since, as has been pointed out, in pursuing such conduct the officials were acting within the scope of their employment. The effect of the absence of express authorization on the award of exemplary damages will be discussed later.

## III.

### *Waiver and Laches*

Point 9 asserts that, despite the jury's finding to the contrary in answer to special issue 12, the evidence establishes as a matter of law that plaintiff had waived any cause of action he might have had against City. Point 10 embodies the contention that plaintiff was guilty of laches as a matter of law.

■ (1). *Waiver.* The testimony shows that a member of plaintiff partnership knew that he had an existing right to disregard City's attempts to halt further development of the subdivision and to proceed with such development without the required permits, but that he had "elected not to do so." Instead, as the evidence shows, negotiations were entered into with SARA for the purpose of determining the exact location of the proposed dam and reservoir, in order to determine the effect it would have on the subdivision, and, after plaintiff was informed of such proposed location, plaintiff continued discussions with the end in view of convincing SARA that the proposed site was not the best site.

"Waiver" is an amorphous term. The various definitions of the term differ to some extent insofar as terminology is concerned, but it appears that the basic notion of intentional relinquishment of a known right lies at the core of all attempted definitions. 60 Tex.Jur.2d, Waiver § 1 (1964). To the extent that the numerous definitions imply that every intentional relinquishment

of a known right results in the loss of that right, they are clearly defective. The attempted definitions are also unsatisfactory in that they are of no help in determining the boundaries of conduct which will be recognized as an effective relinquishment of a right in the absence of consideration for such relinquishment, or in the absence of the elements necessary to the finding of an estoppel or an election of remedies. See 5 Williston, Contracts § 679, pp. 248–56 (3d ed. by Jaeger 1961).

City's answer alleged that plaintiff had waived its right to proceed with the development of its property. The evidence discloses that plaintiff's decision not to continue development when informed of City's actions was based on a reluctance to build homes and attempt to sell them when plaintiff knew, or, at least, had good reason to believe, that such homes would soon be at the bottom of a lake. We refuse to hold that plaintiff's refusal to engage in such economically wasteful conduct and to seek, instead, a lifting of the ban on development constitutes, as a matter of law, and intentional relinquishment of its right to develop its property. At best, from City's viewpoint, plaintiff's conduct was ambiguous, and the factual issue was resolved against City by the jury.

■ (2). *Laches.* No issue on laches was submitted to the jury and, in view of the circumstances, it cannot be said that plaintiff was guilty of unconscionable delay as a matter of law. It is the policy of the law to encourage negotiations between disputants. Consequently, delay resulting from efforts to obtain a settlement, particularly where the circumstances, as here, give rise to a reasonable hope of successful negotiations which will, at least, decrease the extent of injury, delay resulting from a willingness to explore the possibilities of adjustment of differences will be excused. *Shepherd v. Kendrick,* 236 Ala. 289, 181 So. 782 (1938); *Kindsfater v. Mechalke,* 480 P.2d 862 (Colo.App.1970, cert. den.).

Further, in this case the evidence establishes that the actions taken by City were known by City officials to be in violation of plaintiff's rights and that, despite such knowledge and knowledge that a halt in development would result in loss to plaintiff, City officials deliberately proceed to halt development. It is well settled that under such circumstances utmost diligence by the injured party in asserting his rights is not required. *Allen v. Winner*, 389 S.W.2d 599 (Tex.Civ.App.—Houston 1965, writ ref'd n. r. e.).

City, in effect, is saying that a disregard of duty by City officials cast upon plaintiff the duty to disobey municipal regulations, ostensibly enacted for the public good, requiring plaintiff to secure permits. We see no reason to uphold this contention. See *City of Montpelier v. Mills*, 171 Ind. 175, 85 N.E. 6 (1908). According to City, it was incumbent on plaintiff to demand that the third party with whom plaintiff had entered into a contract for the installation of the utility lines, proceed with the work without the necessary permits. Further, plaintiff would, according to City, be under a duty to proceed with such work despite municipal regulations which required municipal approval before new installations could be connected to the existing systems and before municipal service would be extended to the subdivision. The evidence is clear that, in the absence of the required permits, municipal officials would not inspect the work as it progressed and, therefore, plaintiff would be undertaking a risk that he would be denied the right to connect and the right to service because of the absence of the required approval. A rule of law which permits a wrongdoer to insist that his victim subject himself to such expenditures and risks has little to recommend it.

█ Nor does the evidence establish as a matter of law that the delay of which City complains, involving a period of 7 months, worked any disadvantage to City. In this connection City points out that by delaying its resort to the courts plaintiff allowed an enhancement of the damages suffered by it. True, the remedy of mandamus was available to plaintiff. But there is no reason to believe that the mandamus litigation would have been finally resolved in less than 7 months. Nor can it be said that the filing of a mandamus suit would, in some manner, have prevented the accrual of damages while the suit was pending. What the doctrine of laches condemns is not mere delay, but delay that works injury to the opposing party. *City of Fort Worth v. Johnson*, 388 S.W.2d 400 (Tex.1964).

We cannot say that the evidence in this case does more than a question of fact relating to the reasonableness of plaintiff's delay. This disputed fact issue was not submitted to the jury and, even if the facts were such as to allow us to presume that the trial court resolved the factual issue, the fact that judgment was rendered for plaintiff precludes our finding that the implied finding was in favor of defendant.

### IV.

### *Admission of Evidence*

█ City's point 6 complains of the admission into evidence of a newspaper article concerning the informal meeting of October 28, 1971. Point 7 asserts that the trial court erred in admitting into evidence a taped recording of the discussion at such meeting. Point 8 complains of the fact that plaintiff was allowed to read into evidence, under the adverse witness rule, the deposition of Gerald Henckel, who was city manager at the time relevant to this litigation.

We see no cause for reversal in the admission of the newspaper article and the tape. As far as the tape is concerned, there is no contention that it was not properly authenticated, nor does City suggest that it is not an accurate reproduction of the discussions at the meeting. As City so convincingly points out in its brief, the tape tends to support City's contention that the actions of which plaintiff complains were not expressly authorized by City's governing body. As we have already held, the

tape furnishes no evidence of such authorization. We predicated this holding on the contents of the tape itself. It cannot be said that City was in any way prejudiced by the admission of this evidence. We are not persuaded by City's argument that, because of recent sensational stories concerning activities in our nation's capital involving the use of tape recordings, the mention of "tape" or the admission of any taped recordings would, *ipso facto*, be harmful to City.

■ The newspaper article, which was clearly hearsay, indicated that formal council approval of the cooperation agreement had been given at the informal session, when, as we have held, in fact no such formal approval of the agreement took place until one week later, and no such formal approval could have been given at the October 28 session. However, we cannot discern how the erroneous indication of earlier council approval in any way prejudiced City. Insofar as the article might have influenced the jury in returning an affirmative answer to issue 5, concerning authorization, our holding that such answer is without support in the evidence eliminates the possibility of prejudicial effect insofar as the judgment in this case is concerned.

The article contains a conclusionary reference to a "joint venture" between City and SARA. However, plaintiff did not rely, in its suit against City, on any theory based on the existence of a joint venture between the two governmental agencies. That is, plaintiff does not contend that City's liability is a vicarious liability in the sense that City is liable, because of the existence of a joint venture, for SARA's acts. City's liability is based on its own acts. The joint venture issue was relevant only to the question of SARA's liability.

■ Although the deposition witness, Gerald Henckel, was city manager at the time of the occurrence of the acts of which plaintiff complains, his deposition was taken after he had relinquished that position and had severed all connection with City. The deposition was introduced into evidence by plaintiff, and, in answer to some questions which may fairly be categorized as "leading", the witness testified that, as a result of the discussion at the October 28, 1971, informal meeting, there "was no doubt" in his mind that the actions taken by City staff members to halt development of plaintiff's land were necessary in order to protect the "mutual interests" of City and SARA; that he considered the actions of City officials to be within the scope of "Council's directions" to him; that he acquiesced in the actions of his subordinate officials "to protect the City's interest to see that cost of land acquisition was kept to a minimum"; that his purpose was "communicated" to him "as the reason for the Council's authorization of this action"; and that he felt that, as a result of consideration "of this matter" on October 28, he was authorized to take the measures of which plaintiff complains.

The error, if any, in permitting this witness to be treated as an "adverse" witness and sanctioning the use of leading questions is not shown to be prejudicial error requiring reversal. There is an abundance of testimony from other sources to the effect that development of the land was stopped in order to save money in the proposed acquisition of the land. In fact, the existence of this purpose was conclusively established by such other testimony. There is no contention that the portions of Henckel's testimony concerning his interpretation of the discussion at the informal meeting influenced the jury other than in their affirmative answer to special issue 5, which inquired whether the city council had authorized, at the October 28, 1971, get-together, the actions of which plaintiff complains. The question of counsel authorization, at the October 28 meeting, should not, for the reasons already given, have been submitted to the jury, and we have concluded that there is no evidence to uphold such affirmative finding. The elimination of the jury's finding to special issue 5 necessarily

eliminates any possibility of prejudice to City resulting from Henckel's testimony.

## V.

### Joint Venture

Points 13, 14 and 15 assert that the issues relating to the existence of a joint venture between SARA and City should not have been submitted, since there was no evidence of such joint venture; that the jury's findings of joint venture are against the great weight and preponderance of the evidence; and that, in any event, the trial court erred in entering judgment for plaintiff based on the existence of a joint venture because §§ 52 and 53 of Article III of the Texas Constitution, as well as Article XI, § 5 of that constitution, prohibit the existence of such a relationship between the two governmental agencies.

We need not decide the questions raised by these points. Even if it be held that, as a matter of law, no joint venture existed between SARA and City, such conclusion would not require a reversal of the judgment against City. As already pointed out, the judgment against City rests on the acts of City's officials, agents, servants and employees, and not on the existence of any relationship between SARA and City. Since we have held that SARA is not liable to plaintiff in any event, nothing would be gained by discussing the question of joint venture.

## VI.

### Exemplary Damages

Points 16, 17, 18 and 19 challenge the award of exemplary damages against City.

The undoubted general rule in this country is that exemplary damages are not recoverable against a municipality in the absence of express statutory authority for the award of such damages. Anno: 19 A.L.R.2d 903 (1951). Plaintiff states that only two cases allowing recovery of exemplary damages against a municipality have been found, *City of Miami v. McCorkle*, 145 Fla. 109, 199 So. 575 (1940), and *Kelly v. City of Cape Girardeau*, 338 Mo. 103, 89 S.W.2d 41 (1945), and that the holding in *Kelly* was subsequently disapproved in *Chappell v. City of Springfield*, 423 S.W.2d 810 (Mo.1968). In fact, a reading of the *McCorkle* opinion reveals that no exemplary damages were awarded by the jury in that case.

Plaintiff admits that no Texas case has allowed recovery of punitive damages against a municipality, but points to *Peace v. City of Center, Texas*, 372 F.2d 649, 650–51 (5th Cir. 1967), where it was said that under Texas law exemplary damages are recoverable against a municipality only where it is pleaded and proved that the acts giving rise to plaintiff's claim "where committed with . . . malice or evil intent, or such gross negligence as to be equivalent to such intent." In support of this statement, the Federal court cited *Bassham v. Evans*, 216 S.W. 446 (Tex.Civ.App.—Amarillo 1919, no writ); *Town of Jacksonville v. Pinkard*, 40 S.W.2d 841 (Tex.Civ.App.—Texarkana 1931, writ dism'd), and *Ostrom v. City of San Antonio*, 33 Tex.Civ.App. 683, 77 S.W. 829 (Tex.Civ.App.—San Antonio 1903, writ ref'd).

*Bassham* was not a suit against a municipality and, in fact, plaintiff there did not seek recovery of exemplary damages. The issue in *Bassham* was whether mental anguish suffered by plaintiff as a result of being deprived of the use of his property was a proper element of actual damages. Insofar as the opinion refers to the rules applicable to recovery of exemplary damages, the court's attention was clearly focused on a suit against a private individual.

In *Pinkard* the court merely held that the fact that the City's acts had made it necessary for plaintiff to retain lawyers and that the trespass by the city had worried and vexed plaintiffs, such circumstances would not support the award of exemplary damages against the municipality. This tells us nothing about the circumstances under

which punitive damages might be assessed against a city.

In *Ostrom* this Court said, "[T]he case would be exceptional, indeed, when vindictive or more than compensatory damages can be recovered against a municipal corporation." The actual holding in the case was to the effect that vexation, humiliation and annoyance cannot be taken as elements of damages against a city for trespass upon land. 77 S.W. at 829.

Recovery of exemplary damages against a municipality was also denied in *Cole v. City of Houston*, 442 S.W.2d 445 (Tex.Civ. App.—Houston [14th District] 1969, no writ). However, the court merely stated that "as a general rule" neither exemplary damages nor attorney's fees "can be recovered against a municipal corporation . . . ." 442 S.W.2d at 451.

The Texas decisions, then, do not support the statement by the Fifth Circuit insofar as that statement implies that punitive damages against a municipality are recoverable upon a showing that a city is liable for punitive damages if the acts of which plaintiff complains were committed with malice, evil intent or negligence so gross as to be equivalent to evil intent. Insofar as *Bassham* spoke of such malice, evil intent or gross negligence, it was speaking of the showing required to render a private individual liable for exemplary damages. The statement in *Ostrom* to the effect that it would be an "exceptional" case in which a municipality would be liable for exemplary damages was made immediately after the observation that in a proper case exemplary damages would be recoverable for an injury to land. The use of "exceptional" in connection with the liability of municipalities for such damages must be understood as distinguishing cases involving cities from cases not involving cities.

We need not here hold that an award of exemplary damages is proper only when authorized by statute. We go no further than to hold that, absent a showing of concurrence in, or ratification of, the acts of the municipal officers by the governing body, an award of exemplary damages against a municipality is not warranted by Texas law.

That portion of the trial court's judgment granting plaintiff recovery against San Antonio River Authority is reversed and judgment is here rendered that plaintiff take nothing by its suit against San Antonio River Authority. That portion of the judgment awarding plaintiff recovery against the City of San Antonio is reformed by deleting therefrom the award of $25,000.00 as exemplary damages and, as so modified, that portion of the judgment is affirmed.

Plaintiff, Garrett Brothers, shall pay ¾ of the cost of this appeal. The remaining ¼ of the costs of this appeal shall be paid by the City of San Antonio.