# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00598-CV

**The State of Texas and The Texas Water Development Board, Appellants**

**v.**

**Hearts Bluff Game Ranch, Inc., Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
NO. D-1-GN-08-002450, HONORABLE GUS J. STRAUSS JR., JUDGE PRESIDING**

## O P I N I ON

Appellee Hearts Bluff Game Ranch, Inc. ("Hearts Bluff") sued appellants the State of Texas and the Texas Water Development Board ("the Board") (collectively, "the State Defendants") alleging a regulatory taking. The State Defendants filed a plea to the jurisdiction, which the trial court denied. On appeal, the State Defendants argue that the jurisdictional facts pleaded by Hearts Bluff do not allege a valid regulatory taking and, consequently, that Hearts Bluff has not pleaded a claim for which sovereign immunity has been waived. We will reverse the trial court's order and dismiss the cause for lack of subject-matter jurisdiction.

### FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from Hearts Bluff's live pleading.

Hearts Bluff's sole line of business is "mitigation banking." Under federal law, a mitigation bank is a preserved, restored, established, or enhanced wetland area set aside in perpetuity

to compensate for unavoidable losses to similar wetland areas elsewhere. In exchange for creating a mitigation bank, a landowner receives valuable "mitigation banking credits" from the federal government, which the landowner sells to third parties who are required under federal law to offset some other environmentally harmful activity. Unlike other forms of environmental-damage mitigation under federal law, mitigation banks are not situated directly adjacent to the site of the negative environmental impact. Rather, a mitigation bank is established as a distinct conservation area located somewhere within the same watershed as the negative environmental impact that it offsets. The Army Corps of Engineers ("the Corps") is, in most cases, the federal agency primarily responsible for designating mitigation banks and issuing mitigation-banking credits.

Hearts Bluff purchased approximately 4,000 acres of bottomland—a term used to describe seasonally or continuously flooded deciduous hardwood river swamps—in Titus County, a rural county east of Dallas, with the intention of creating a mitigation bank. The land is located near the Sulfur River, an area that, off and on for at least twenty years, has been considered by the State Defendants as a site for a future water reservoir called the Marvin Nichols Reservoir ("the Reservoir"). The Reservoir, if created, would inundate all of Hearts Bluff's land, thereby preventing it from being used as a perpetual mitigation bank. When it purchased the land, Hearts Bluff was aware that the State Defendants had considered creating the Reservoir and knew that its land was within the Reservoir's footprint. Hearts Bluff assumed, however, that the Reservoir was "only an idea that had been floating around for forty years" because the State Defendants had taken no "concrete" steps toward its formation.

2

It is undisputed that the Reservoir was controversial from its conception, as it pitted rural interests against urban by proposing to flood a vast tract of rural land to meet the water needs of Dallas-Fort Worth. According to Hearts Bluff's petition, controversy over the fate of the Reservoir existed even within the ranks of the regional and state water planners themselves. Hearts Bluff pleaded that the Region D Water Planning Group—one of several regional planning groups that, together with the Board, develop the state water plan—purposely omitted the Reservoir from its 2006 regional water plan in an effort to "kill" the project. In light of this controversy, Hearts Bluff assumed that plans for the Reservoir were either "dead" or "dying." Hearts Bluff pleaded:

> In 2004, when Hearts Bluff acquired its property in Titus County, [the Reservoir] was merely an idea. It had not yet been declared to be a necessary or feasible project. And, no decisions had been made with respect to whether it would ever or even needed to be built.

Although it assumed that the Reservoir's construction was unlikely, before purchasing the land, Hearts Bluff consulted with the Corps about the viability of forming a mitigation bank on the site in light of the possibility that the Reservoir might be built. According to Hearts Bluff's petition, "[t]he Corps told Hearts Bluff there were no impediments to permitting that site [as it was] and that because mitigation banks are comprised of wetlands, mitigation banks routinely are found in the footprint of potential reservoir sites."

After Hearts Bluff bought the land and conducted an engineering survey, it applied to the Corps for a permit to create a mitigation bank.[1] In September 2004, the Corps sent notice of

---

[1] The parties dispute whether the Corps's designation of land as a mitigation bank in exchange for its allocation of mitigation banking credits is a "permit" or a "contract"—i.e., whether

the application to all known interested parties, including the Board, and solicited public comment. It was at this point, Hearts Bluff contends, that the State Defendants began their efforts to actively block Hearts Bluff's application. Hearts Bluff pleaded that the Board and the Region C Water Planning Group ("Region C") immediately began "intense lobbying" of the Corps to convince it to deny Hearts Bluff's application. Hearts Bluff also pleaded that the State Defendants took "efforts to discourage [Hearts Bluff's engineering firm] from continuing to represent Hearts Bluff in connection with the mitigation banking process," resulting in the firm's dropping Hearts Bluff as a client.

According to Hearts Bluff, beginning "in or before December of 2004," the Board "began to formulate a plan to deny the Hearts Bluff mitigation banking permit and reserve the property for its own purposes." According to Hearts Bluff's pleadings, the State Defendants had two motivations. "First, the State Defendants were concerned that a mitigation banking permit might preempt the State's later actions to acquire property for the [Reservoir]." In other words, if the mitigation bank were to exist, federal law might prevent the State from later taking the property for use as a reservoir. "Second, the State Defendants were very concerned that their costs in creating the [Reservoir] would be much higher if Hearts Bluff received its permit."

Shortly after it received notice from the Corps, the Board contacted the Corps in writing, expressing concerns that the proposed mitigation bank would make the planned reservoir project less viable, if not entirely infeasible. It also sought to convince the Corps that the site's lack

---

the process is regulatory in nature or more akin to a contractual relationship. We find the distinction immaterial to the disposition of this appeal; therefore, for simplicity, we use the term "permit."

4

of a "unique-reservoir-site" designation, a legislative designation that prevents state agencies from acquiring land within the site, was irrelevant to the Corps's consideration of whether the reservoir was likely to be built—a position that Hearts Bluff asserts the Board later reversed once the site received such a declaration. Hearts Bluff also pleaded that Region C asserted to the Corps that its designation of the Reservoir as part of its regional water management strategy meant that the entire footprint of the Reservoir was essentially "off limits" to development.

After Hearts Bluff made minor changes in its mitigation-permit application in mid-2005, the Corps told Hearts Bluff that it had completed the "technical requirements" for receiving a permit. In the autumn of that year, Hearts Bluff asserts that the Corps told it to expect a "Christmas present"—i.e., that its permit application was all but assured and would be granted before the end of the year. Meanwhile, according to Hearts Bluff's pleadings, the state water planners continued to fight over the Reservoir's fate:

> In the Spring of 2005, during the development process for the 2006 Regional Water Plan, Region D declined to support [the Reservoir] as a unique reservoir site. The Region D Board members had consulted with the TWDB to determine what steps were necessary to kill [the Reservoir project].

According to Hearts Bluff, the Board soon discovered that the Corps might be ready to approve its permit and began working in earnest to block the application. Some of the Board's efforts were apparently directed at countering Region D's efforts to "kill" plans for the Reservoir, including enlisting Region C to resurrect the plans.

> In the fall of 2005, [the Board] realized that unless it moved quickly, the Corps was about to approve the Hearts Bluff mitigation banking permit, perhaps as early as

5

> January of 2006, because Hearts Bluff had complied with all the requirements for the issuance of the permit. So, [the Board] informed the Corps that the Region C Water Plan would include [the Reservoir] as a recommended water management strategy and, for the first time, that it **would be designated** as a site of unique value for the construction of a reservoir.

(Emphasis in original.) After learning that the Board would likely include the Reservoir in its 2006 state water plan and recommend to the legislature that it be designated as a unique-reservoir site, the Corps decided to delay issuing the permit until after the Board's April 2006 meeting. At that meeting, the Board adopted Region C's water plan, which included plans for the Reservoir. The Corps then contacted Hearts Bluff, indicating that it would delay its decision until after the 2007 legislative session to see if the legislature adopted the Board's proposed water plan. Hearts Bluff declined to wait and instead asked the Corps to rule on its permit as soon as possible. On July 13, 2006, the Corps denied Hearts Bluff's permit request, citing the Board's opposition and the fact that Texas's long-term water needs appeared to conflict with maintaining a permanent mitigation bank on Hearts Bluff's land.

Hearts Bluff asked the Corps to reconsider its decision, suggesting a limited-term mitigation bank instead of a perpetual bank. The Corps denied the request on the ground that mitigation banks must be perpetual. In the time between the Corps's first and second denials, the legislature passed the Board's proposed water plan and designated the Reservoir site as a unique reservoir site.[2]

---

[2] The unique-reservoir-site designation in the present case is itself unique. Normally unique-reservoir sites are designated pursuant to section 16.051(g) of the water code, which provides:

Hearts Bluff sued the State Defendants, alleging that their actions with respect to the Corps's denial of its mitigation-banking permit was a regulatory taking under the Texas and federal constitutions because the State Defendants' actions stripped its land of "all economically viable uses." Hearts Bluff pleaded that its permit

> application satisfied all ecological, environmental, economic and other technical scientific criteria for the issuance of a permit. The only criteria which Hearts Bluff did not satisfy was the criteria that the mitigation bank "exist in perpetuity." And the only reason the Corps found that Hearts Bluff did not satisfy that criteria was that the Hearts Bluff mitigation bank was located within the footprint of a reservoir that was a unique reservoir site, suitable for construction, that was to be and actually was adopted by the State legislature.

---

> The legislature may designate a site of unique value for the construction of a reservoir. A state agency or political subdivision of the state may not obtain a fee title or an easement that would significantly prevent the construction of a reservoir on a site designated by the legislature under this subsection.

Tex. Water Code Ann. § 16.051(g) (West 2008). The designation here, however, was made by enacting a new provision, section 16.051(g-1), which provides:

> Notwithstanding any other provisions of law, a site is considered to be a designated site of unique value for the construction of a reservoir if the site is recommended for designation in the 2007 state water plan adopted by the board and in effect on May 1, 2007. The designation of a unique reservoir site under this subsection terminates on September 1, 2015, unless there is an affirmative vote by a proposed project sponsor to make expenditures necessary in order to construct or file applications for permits required in connection with the construction of the reservoir under federal or state law.

*Id*. § 16.051(g-1).

7

Hearts Bluff also pleaded that

> [b]ut for the State Defendants' actions . . . the Corps would have granted Hearts Bluff its mitigation banking permit. . . . [T]he granting of a mitigation banking permit is a common and routine thing which the Corps normally encourages. . . . [T]he granting of the mitigation banking permit by the Corps would certainly have occurred had the State Defendants not intervened . . . .[3]

The State Defendants filed a plea to the jurisdiction, asserting that Hearts Bluff had failed to plead a valid taking claim and, consequently, had failed to plead a claim for which sovereign immunity was waived. The trial court denied the plea, and the State Defendants filed this interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014 (West 2008) (allowing interlocutory appeal from denial of plea to jurisdiction of governmental entity).

---

[3] The parties disagree on whether the Corps has discretion to deny a mitigation-banking permit. The State Defendants cite guidance from the Federal Register on the establishment of mitigation banks as evidence that the Corps has discretion. *See Federal Guidance for the Establishment, Use and Operation of Mitigation Banks*, 60 Fed. Reg. 58,610 (Nov. 28, 1995) ("No agency is required to sign a banking instrument . . . .").

Hearts Bluff asserts that the cited quote from the Federal Register is taken out of context and applies only to state, local, and tribal agencies that might be participating on a mitigation-bank-review team.

We believe the regulations governing the creation of mitigation banks clearly allow the Corps to exercise its discretion to approve or deny a mitigation-banking permit. *See, e.g.*, 33 C.F.R. §§ 332.8(b)(4) (2009) ("The district engineer alone retains final authority for the approval of the [mitigation-banking agreement] where the mitigation bank or in-lieu fee program is used to satisfy compensatory mitigation requirements of [Department of the Army] permits."), 332.8(d)(5)(ii)-(iii) (district engineer has discretion to accept or reject proposed mitigation bank), 332.8(d)(8) (following conclusion of any dispute-resolution process among the members of the review team, if any, "the district engineer will notify the sponsor of his final decision"). Furthermore, even if the Corps was required to grant every permit application meeting its guidelines, it would still retain discretion to determine *whether* those guidelines were met.

## STANDARD OF REVIEW

Whether a court has subject-matter jurisdiction is a question of law, which we review de novo. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). When reviewing a grant or denial of a plea to the jurisdiction, we consider the plaintiff's pleadings, construed in favor of the plaintiff, and any evidence relevant to jurisdiction without considering the merits of the claim beyond the extent necessary to determine jurisdiction. *Id.* at 226-27; *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002).

Here, the State Defendants' primary contention is that Hearts Bluff's pleaded jurisdictional facts, taken as true, do not give rise to a legally cognizable taking claim. In the absence of a properly pleaded taking claim, the State Defendants would retain sovereign immunity. *See General Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 599 (Tex. 2001) (sovereign immunity is not waived unless claim for which it is waived is properly pleaded). When, as here, the jurisdictional facts are undisputed, the court should make the jurisdictional determination as a matter of law. *Miranda*, 133 S.W.3d at 226, 228. If the plaintiff's pleadings "affirmatively negate the existence of jurisdiction," then a plea to the jurisdiction may be granted without affording the plaintiff an opportunity to amend its pleadings. *Id.* at 226-27. If, however, the pleadings do not "demonstrate incurable defects in jurisdiction," but merely fail to allege sufficient facts to affirmatively show the trial court's jurisdiction, then the plaintiff should be given an opportunity to amend. *Id.*

9

## DISCUSSION

### *Regulatory Takings In General*

A regulatory taking occurs when the government "impose[s] restrictions that either (1) deny landowners of all economically viable use of their property, or (2) unreasonably interfere with landowners' rights to use and enjoy their property." *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 935 (Tex. 1998). To give rise to a regulatory taking, the governmental action must, at a minimum, create a "current, direct restriction on the property's use." *Westgate, Ltd. v. State*, 843 S.W.2d 448, 452 (Tex. 1992). "[P]ublicly targeting a property for condemnation, resulting in economic damage to the owner, generally does not give rise to an inverse condemnation cause of action unless there is some direct restriction on use of the property." *Id.* at 453. If the proposed future regulation merely "threaten[s] some possible future loss," then no taking has occurred. *Id.* If, however, in planning future condemnation, the government uses its regulatory authority to stymie development of land in order to reduce future acquisition costs, then there may be a regulatory taking. *See City of Austin v. Teague*, 570 S.W.2d 389, 394 (Tex. 1978); *San Antonio River Auth. v. Garrett Bros.*, 528 S.W.2d 266, 273 (Tex. Civ. App.—San Antonio 1975, writ ref'd n.r.e.).

### *State Defendants' Issue on Appeal*

In their sole issue, the State Defendants assert that Hearts Bluff has not properly pleaded a regulatory-taking claim and, consequently, that the State Defendants retain their sovereign immunity from liability and suit. The State Defendants assert that Hearts Bluff's pleadings have not and cannot, given their pleaded jurisdictional facts, allege that the State Defendants have imposed any current, direct restrictions on the use of its property, for two reasons. First, the State Defendants'

conduct in announcing their plans to condemn Hearts Bluff's land in the future does not present a current, direct restriction on Hearts Bluff's land. Second, even assuming that the Corps's denial of Hearts Bluff's permit request was a current, direct restriction on its property rights, the State Defendants' conduct did not "cause" that restriction because "neither [the State nor the Board are] empowered to grant or deny [the mitigation-banking permit]." Finding the second argument dispositive, we need not discuss the first.

### *Elements of Inverse Condemnation*

Hearts Bluff sued the State Defendants for inverse condemnation, alleging a regulatory taking under article I, section 17 of the Texas Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. In an inverse-condemnation suit, a property owner seeks compensation for a taking that has allegedly already occurred and requests just compensation from the government. The general elements of an inverse condemnation are: "(1) an intentional act of a government entity; (2) accomplished for a public purpose; (3) that damages or takes property from a private citizen." *Domel v. City of Georgetown*, 6 S.W.3d 349, 357 (Tex. App.—Austin 1999, pet. denied). Hearts Bluff notes that Texas courts also formulate the test using the following elements: "(1) the governmental entity intentionally performed an act in the exercise of its lawful authority; (2) that resulted in the taking, damaging, or destruction of the party's property; (3) for public use." *City of Midlothian v. Black*, 271 S.W.3d 791, 799 (Tex. App.—Waco 2008, no pet.). Hearts Bluff notes that "it wasn't until the late 1990s that Texas courts began routinely listing the elements of an inverse condemnation case [as they do above]." We assume Hearts Bluff's implication is that the latter test differs substantively from the former because it uses different

11

language.  While we think that the two tests are essentially identical in their substantive requirements and that our analysis would be the same under either test, we will apply the test cited by Hearts Bluff.

***The Elements Applied:  "Cause in Fact" Relationship Insufficient***

The parties agree that Hearts Bluff pleaded sufficient jurisdictional facts to meet the requirements of the first and third elements of the test.  It pleaded that the State Defendants performed certain acts for a public purpose in the exercise of their lawful authority.  The dispositive question here is whether those acts, as Hearts Bluff pleaded them, could "result in" a taking.  With respect to the second element, Hearts Bluff argues that

> the State Defendants are responsible for their own acts which **resulted in and caused** the taking of Hearts Bluff's property.  If all Hearts Bluff pleaded was that the denial of the permit by the Corps was a taking by the State, the State Defendants' argument [about why they are not liable for a taking here] might have more substance. However, Hearts Bluff has identified a series of intentional, purposeful acts that were undertaken by the State Defendants in the exercise of their lawful authority—the inclusion of [the Reservoir] in the 2006 Region C Water Plan and the 2007 State Water Plan, the approval of the 2006 Region C Water Plan and the 2007 State Water Plan by [the Board], the adoption of the 2007 State Water Plan by the Legislature, and the initiation of the *Reservoir Site Protection Study* **with its stated goal being to inhibit private development within the footprint of reservoirs, including [the Reservoir]**, culminating with the declaration of [the Reservoir] by the Legislature as a unique site suitable for the construction of a reservoir—all of which resulted in the denial of the permit and the taking of Hearts Bluff's property.

(Emphasis in original.)

Because Hearts Bluff pleaded it, we assume that the State Defendants' actions convinced the Corps to deny Hearts Bluff's permit application.  In other words, we assume that "but for" the State Defendants' actions, the Corps would have issued the permit.  Even assuming that,

however, Hearts Bluff has not met its pleading burden. A review of relevant case law leads us to conclude that pleading a valid taking claim requires more than a simple "but-for," cause-in-fact relationship between the state action and the alleged harm. Rather, implicit in the test for inverse condemnation are two understood requirements: (1) the governmental entity against whom the claim is brought must possess—or have possessed during the relevant time period—the regulatory power that effected the taking, and (2) the governmental entity's exercise of its own regulatory power must have imposed the current, direct restriction that gave rise to the taking.

In *Garrett Brothers*, the plaintiff owned land on which it was actively building a subdivision. 528 S.W.2d at 269. The San Antonio River Authority ("SARA") wanted to build a park on the same site. *Id.* SARA officials met with the City of San Antonio to express concerns that the plaintiff's development activities would make the land too expensive to later condemn and use as a park. *Id.* Shortly after the consultation, the City's director of planning ordered various municipal departments to stop installing utilities at the plaintiff's subdivision and ordered the planning office to stop issuing construction permits to the plaintiff. *Id.* at 270. After six months of study, SARA decided that another site would make a better park and told the City it was no longer interested in the plaintiff's land. *Id.* Construction resumed on the subdivision, but the plaintiff sued the City and SARA for a regulatory taking for the six-month delay. *Id.* On appeal from a jury award in favor of the plaintiff, SARA advanced what it labeled an "ultra vires" argument. *Id.* at 271. The court held that because SARA did not possess regulatory authority, it could not be held liable for a regulatory taking:

> SARA wholly lacks authority to regulate the development of subdivisions. . . . Even if it be assumed that SARA's governing body [authorized] the acts of its executive personnel [in colluding with the City to stop the plaintiff's development], the conclusion is inescapable that the conduct of SARA's executive officers was in relation to matters wholly beyond the ambit of SARA's powers. SARA wholly lacked the authority to interfere with plaintiff's development of the subdivision under any circumstances.

*Id.* As to the City of San Antonio, on the other hand, the court affirmed.

Under similar facts, federal courts have arrived at the same conclusion. *See B & G Enters. v. United States*, 220 F.3d 1318, 1321 (Fed. Cir. 2000) (state action can be attributable to federal government for taking liability only if state actors were "agents" of federal government); *see also Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1195-96 (Fed. Cir. 2004) (same); *Mackin v. City of Couer D'Alene*, 551 F. Supp. 2d 1205, 1209 (D. Idaho 2008) (regulatory-taking claim cannot result from suit to determine governmental entity's scope of claim to land because court "exercised *its* power," not governmental entity, even though governmental entity initiated suit) (emphasis added).

In *B & G Enterprises*, B & G, the owner and operator of vending machines in California, alleged a regulatory taking against the federal government based on the California legislature's enactment of restrictive regulations on the use of tobacco vending machines. 220 F.3d at 1321. The federal government conditioned the states' receipt of grant money on their passing and enforcing laws that regulated minors' access to tobacco products. *Id.* "The proposed [federal] regulation did not make tobacco vending machine restrictions a condition of the receipt, but the [regulating body] did *suggest* that states ban tobacco vending machines or restrict their placement . . . ." *Id.* (emphasis in original).

14

The federal government asserted that it was not the "regulator" in that case, and thus could not be held liable for a regulatory taking. The court agreed, basing its holding on several grounds. *Id.* at 1323. First, precedent established that the federal government's conditioning a state's receipt of funds on the enactment of certain laws did not expose the federal government to liability for a taking. *Id.* Second, "California's legislature [could not] be considered to have acted under federal authority." *Id.* at 1324. In other words, California had discretion to enact the law or not; that its entitlement to federal funding hinged on its decision did not fetter its discretion. *Id.* Third, the court distinguished that case from situations in which the federal government has been held liable for a taking because state officials were held to be acting as agents of the federal government "under the authority of a federal order or law." *Id.* Fourth, the court noted that California's regulation was enacted "for the benefits of its own citizens, not for the benefit of Americans generally." *Id.* at 1325. This factor is important because it zeros in on the essence of a regulatory taking. The regulatory-taking test, at its core, requires a court to decide whether, "'in all fairness and justice,'" the burdens of any given regulation "'should be borne by the public as a whole'" instead of by those property owners affected by the regulation. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)); *Sheffield Dev. Co. v. City of Elgin Heights*, 140 S.W.3d 660, 672 (Tex. 2004). Thus, the scope of the regulation at issue was crucial. If the benefits of California's law only accrued to Californians, then it makes little sense to impose the burdens of the regulation on all Americans. *See B & G Enters.*, 220 F.3d at 1325. Finally, the court noted that "it was California's decision to create

restrictions on the placement of tobacco vending machines, not the federal government's. Congress may have provided the bait, but California decided to bite." *Id.*

The California legislature in *B & G Enterprises* and the City of San Antonio in *Garrett Brothers* occupied similar "regulatory" positions in those cases as the Corps does in the present case. In *B & G Enterprises*, while the federal government's promise of cash provided the California legislature with an incentive to enact the complained-of regulation, the decision whether to do so was left to California. Similarly, in *Garrett Brothers*, while SARA's plan for the park provided the City an incentive to stop the plaintiff's development, the City was the entity held liable for taking the plaintiff's property because only the City had the power to regulate the plaintiff's development. In the present case, while the State Defendants provided an incentive—in the form of persuasive lobbying—for the denial of Hearts Bluff's permit, the ultimate decision was the Corps's. The Corps cannot be considered to have acted under the authority of the state of Texas; nor can we say that the Corps, under the facts alleged here, was acting as an "agent" of the state government. The Corps, a federal government agency that implements federal law and federal policy, is presumed to have made its decision denying Hearts Bluff's application based on federal guidelines for the benefit of the United States as a whole. In sum, the State Defendants might have been instrumental in persuading the Corps to deny Hearts Bluff's permit application, but, in the end, it was the Corps's decision to make.

Hearts Bluff argues that *Garrett Brothers* is distinguishable because Hearts Bluff "has identified a series of intentional, purposeful acts that were undertaken by the State Defendants in the exercise of their lawful authority . . . all of which resulted in the denial of the permit and the

16

taking of Hearts Bluff's property." We acknowledge that the present case differs from *Garrett Brothers* in one major respect. Unlike SARA in *Garrett Brothers*, the State Defendants *have* regulatory powers, and the State Defendants' actions that Hearts Bluff contends contributed to the alleged taking—like the designation of the land in question as a unique-reservoir site and the enactment of the state water plan—were done pursuant to those powers. Hearts Bluff contends that this "regulatory authority" is key:

> A private party could not interfere with the Corps' [sic] requirement that a mitigation bank exist "in perpetuity". Only a governmental entity could do that through its general eminent domain powers for public uses. The link between the intentional actions and the taking is factual—the act must "result in" the taking, which is what Hearts Bluff has alleged.

Assuming that Hearts Bluff is correct that "only a governmental entity" could interfere with the Corps's requirement that a mitigation bank exist forever, it still cannot allege that the State Defendants had the power to grant or deny the mitigation-banking permit here, only that, at most, they had some influence over the Corps. The real source of Hearts Bluff's alleged regulatory taking is the denial of the mitigation-banking permit. As Hearts Bluff asserts: "The denial of the permit itself is a current, direct restriction on Hearts Bluff's ability to develop its property." Indeed, if we survey the State Defendants' actions outside the lens of their influence on the Corps, it would seem unlikely that those actions, taken alone, would amount to much more than mere announcements of plans to condemn land in the future. *See Westgate, Ltd.*, 843 S.W.2d at 453 ("[P]ublicly targeting a property for condemnation, resulting in economic damage to the owner, generally does not give

17

rise to an inverse condemnation cause of action unless there is some direct restriction on use of the property.").

Even taking as true that the State Defendants acted as Hearts Bluff alleged, the fact remains that the Corps retained discretionary authority to grant or deny Hearts Bluff's permit. The Corps did not need the State Defendants' permission and was free to grant the permit, even in the face of strong opposition. In short, advocacy of the type alleged here is not the same thing as regulation. While there might be some point at which a non-regulating governmental entity's conduct could cross the threshold from mere advocacy into indirect control, such that courts could impute the exercised regulatory power to that entity, that point is not reached here.

### *Opportunity to Amend*

Hearts Bluff requests an opportunity to amend its pleadings. Amendment is proper only if Hearts Bluff's live pleadings do not affirmatively negate the existence of jurisdiction. *Miranda*, 133 S.W.3d at 226-27. If they do, then it is not entitled to an opportunity to amend. *Id*. For the reasons discussed above, we conclude that Hearts Bluff's pleadings affirmatively negate jurisdiction. By pleading facts that, if true, could not constitute a regulatory taking against the State Defendants, Hearts Bluff has pleaded itself out of court. *See Little-Tex Insulation Co.*, 39 S.W.3d at 599-600 (plaintiff's pleadings affirmatively negated jurisdiction when, assuming facts alleged in petition were true, plaintiff did not allege legally cognizable taking claim).

## CONCLUSION

Hearts Bluff's pleadings negate the existence of a valid regulatory-taking claim against the State Defendants; therefore, it has not pleaded a cause of action for which sovereign immunity has been waived. Because sovereign immunity has not been waived, the trial court lacked subject-matter jurisdiction. We reverse the trial court's order denying the State Defendants' plea to the jurisdiction and dismiss the cause for want of subject-matter jurisdiction.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Reversed and Dismissed

Filed:  May 13, 2010

19