CITY OF AUSTIN, Petitioner,

v.

Joe M. TEAGUE et al., Respondents.

No. B-7197.

Supreme Court of Texas.

July 26, 1978.

Rehearing Denied Oct. 4, 1978.

Jerry L. Harris, City Atty., Roy Rutland, III, Asst. City Atty., Austin, for petitioner.

Stayton, Maloney, Hearne & Babb, William M. Knolle and Douglass D. Hearne, Austin, for respondents.

POPE, Justice.

Joe M. Teague, Adon Sitra and Cecil Ruby Company, Inc. sued the City of Austin for damages for inverse condemnation of eight and one-half acres of land bordering South Interregional Highway 35 in Austin, Texas. They asked also for an order commanding the City to issue a Water Development Permit required by the City's Creek Ordinance. After a jury trial the court ordered the City to issue the requested permit and rendered judgment for $109,939 for a taking and damaging of the property for the period from June 26, 1975, to November 1, 1976. The City obeyed the order to issue the permit and did not appeal from that part of the judgment. It appealed only from the judgment for damages. The court of civil appeals affirmed the judgment of the trial court conditioned upon a remittitur of $30,000 which the plaintiffs accepted. 556 S.W.2d 400. We reverse the judgments of the courts below and remand the cause to the trial court for a retrial of the damage issue.

When the plaintiffs purchased the land in late 1972, it was zoned as a local retail district. That zoning permitted such businesses as banks, motels, grocery stores and buildings up to sixty-five feet in height. In January, 1973, the plaintiffs bulldozed the brush, trees and other vegetation from the site to prepare the land for development. On January 11, 1973, local residents appeared before the City Council and urged it to stop further development. They asked the Council to take steps to have the site preserved as a scenic easement bordering the southern approach to downtown Austin. On January 26 the Council responded by adopting a resolution requesting the Texas Highway Department to study the feasibility of acquiring the land as a scenic easement.[1]

Plaintiffs a short time later applied to the Austin Department of Public Works for a permit to enclose in concrete culverts Harper's Branch and a small tributary called the Ramble, both of which crossed the tract. That department's approval of the permit was appealed to the Planning Commission, which denied the application on April 10, 1973. At that time, plaintiffs were in complete compliance with the demands of every existing ordinance. At the meeting in which the Commission denied the permit, the Director of Planning recommended changes in certain existing ordinances and time for further study of the proposed changes. Plaintiffs then offered to sell the tract to the Texas Highway Department at a price below market value, but the offer was declined.

Plaintiffs submitted a second application for a permit after agreeing to a number of restrictions that were not included in the first application. The City Engineer again recommended that the permit be granted. On appeal, the Planning Commission had a tie vote which, under the City ordinance, did not operate to defeat the City Engineer's decision. On February 14, 1974, the City Council again denied the permit.

1. Whereas it has come to the attention of the City Council that certain land which is bound on the north by Riverside Drive and runs south along Interstate Highway 35 and through which a creek known as Harper's Branch, is being developed in such a manner that many trees and shrubs are being destroyed, and in such a manner that the natural state of Harper's Branch will be altered by the installation of pipe and other man-made facilities; and

Whereas the above described land constitutes one of the most natural scenic areas within the City of Austin, and presents a beautiful and inspiring gateway to the Capitol City for all those who enter the City on the South Interregional Highway 35; and

Whereas many citizens of Austin have expressed concern over the destruction of the natural beauty of this scenic creek area; and

Whereas various citizens have contacted the Highway Department of the State of Texas, urging the Department to acquire this land for a scenic easement,

Now, Therefore, be it resolved by the City Council of the City of Austin, that by this present City Council of the City of Austin does hereby support the effort of all those who are working toward the preservation of the above described area, and does hereby formally request that the State of Texas Highway Department immediately investigate the feasibility of acquiring the above described land as a scenic easement for the benefit of all the citizens of the State of Texas.

The City ordinances under which plaintiffs had made their two applications for a permit required compliance with certain engineering, drainage, and structural requirements, all of which the plaintiffs fulfilled. On February 14, 1974, the same day that the City Council denied the second application, the City Council set a date for a public hearing on what is called the New Creek Ordinance, which was adopted on March 7, 1974. That ordinance provided in its section (f) that any development must preserve "the natural and traditional character of the land and waterway to the greatest extent feasible."[2] The new ordinance for the first time required a Waterway Development Permit.

In February, 1975, the plaintiffs filed a third application for a permit. Plaintiffs' application eliminated the earlier proposal to enclose Harper's Branch in a culvert and proposed instead that the creek be rechannelled and lined with hand-laid stone. The Engineering Department and the Planning Commission again approved the application, but the City Council denied the third application on June 26, 1975. The New Creek Ordinance, which had been adopted after the second application was denied, was the basis of the third denial.

The posture in which the case reaches us is that the City wrongfully denied the permit sought by plaintiffs' third application. The trial court ordered the City to issue the permit to plaintiffs, and from that part of the judgment, the City did not appeal. The City cannot now dispute that its action was, as stated by the court of civil appeals, "un-authorized, unreasonable, arbitrary and an invalid exercise of the police power." The City's denial of the permit was (1) to prevent all development of the tract and (2) to preserve it as a scenic easement for the benefit of the public.

The City seeks to escape liability for damages by its contention that the denial of a permit was an exercise of its "police power." Plaintiffs, on the other hand, say that the Texas Constitution entitles them to damages for the City's exercise of the power of "eminent domain." Tex.Const. art. I, § 17. The labels are not helpful. These two doctrines—police power and eminent domain—merge at so many places when applied to specific problems, that the legal battlefields have been variously termed a "sophistic Miltonian Serbonian Bog," *Brazos River Authority v. City of Graham*, 163 Tex. 167, 176, 354 S.W.2d 99, 105 (1962); a "crazy-quilt pattern," *San Antonio River Authority v. Garrett Brothers*, 528 S.W.2d 266, 273 (Tex.Civ.App.—San Antonio 1975, writ ref'd n. r. e.); "the manifest illusoriness of distinctions," *DuPuy v. City of Waco*, 396 S.W.2d 103, 107 (Tex.1965); producing decisions that are "conflicting, and often . . . irreconcilable in principle." *Sauer v. City of New York*, 206 U.S. 536, 548, 27 S.Ct. 686, 690, 51 L.Ed. 1176 (1906). It is for that reason that this court has in three decisions rejected the dichotomy, holding that one's property may not be taken without compensation under some circumstances even in the exercise of the police power. *DuPuy v. City of Waco, supra*; *San Antonio River Authority v. Lewis*, 363

---

2. The ordinance provided:

"A development permit shall be issued if upon review of the application therefor it is found:

(a) That the development plans provide a sufficient waterway for the design flood, due allowance having been made for the fact that the quantity of water coming down any waterway may be increased as storm sewers and drains are built in the future; and,

(b) That any proposed walls, arches or whatsoever other form of proposed improvements are of sufficient strength to resist any pressure of earth or building from the outside and pressure or abrasion of water and debris from the inside; and,

(c) That all proposed grades are such that water will not gather in pools which may become stagnant or foul; and,

(d) That the proposed development will not result in additional identifiable adverse flooding of other property; and,

(e) That both temporary and permanent erosion control measures are adequate to minimize siltation of the waterway; and,

(f) That the proposed development preserves the natural and traditional character of the land and waterway to the greatest extent feasible."

S.W.2d 444 (Tex.1963); *Brazos River Authority v. City of Graham, supra.*

City of Austin relies upon several correctly decided cases which, for one reason or another, placed their decisions under the aegis of police power. They include *City of San Antonio v. Pigeonhole Parking of Texas,* 158 Tex. 318, 311 S.W.2d 218 (1958); *Ellis v. City of West University Place,* 141 Tex. 608, 175 S.W.2d 396 (1943); *Urban Renewal Agency of Austin v. Georgetown Savings & Loan Ass'n,* 509 S.W.2d 419 (Tex. Civ.App.—Austin 1974, writ ref'd n. r. e.); *Thurow v. City of Dallas,* 499 S.W.2d 347 (Tex.Civ.App.—Dallas 1973, writ ref'd n. r. e.); *City of Houston v. Biggers,* 380 S.W.2d 700 (Tex.Civ.App.—Houston 1964, writ ref'd n. r. e.); *Kirschke v. City of Houston,* 330 S.W.2d 629 (Tex.Civ.App.—Houston 1959, writ ref'd n. r. e.).

In *Brazos River Authority v. City of Graham, supra,* the Authority had erected a dam and because of siltation in the lake, water was backed into the City of Graham's sewage disposal plant. City of Graham filed a suit for inverse condemnation which Brazos River Authority defended upon the principle that it was only exercising police power for which the government is not liable. While recognizing that the lines between police power and the power of eminent domain are often blurred and disregarded, this court held that a decent regard for private property rights, rights that enjoy the protection of the constitution, required governmental agencies in acquiring properties for public purposes generally to proceed under the power of eminent domain rather than under the police power. In that case there was an actual taking. The principle was extended in *San Antonio River Authority v. Lewis,* 363 S.W.2d 444 (Tex. 1963), to protect a landowner's right to have the waters of the San Antonio River that he used for irrigation purposes to continue to flow in their accustomed channel. The court again refused to place the case on one side or the other of the mysterious line which is supposed to divide police power from eminent domain, and held that the City was liable for damages.

In *DuPuy v. City of Waco, supra,* this court even more thoroughly summarized the precedents which denied damages to a landowner that arose as an incident to the exercise of the police power and compared those with our other cases which awarded damages to a landowner to protect private property rights when the owner suffers losses not common to the general public. After reviewing the several efforts to find the line between police power and eminent domain, this court again refused to "compartmentalize" what is manifestly illusory. The court in *DuPuy* after permitting recovery because the property owner was denied all reasonable access to his property, contrasted that holding with the denial of damages where there was only an incidental interference with the right of access. *See Moorlane Company v. Highway Department,* 384 S.W.2d 415 (Tex.Civ.App.—Amarillo 1964, writ ref'd n. r. e.). In *DuPuy* we discussed most of the cases relied upon by City of Austin in this present case. We deem it unnecessary to repeat the analysis of the specific cases which reached varying results.

*DuPuy v. City of Waco, supra,* is this court's last expression of our rejection of the categorization of governmental conduct as an exercise of police power or as an exercise of eminent domain. The case went further, however, and stated that there were better tests. We held that a government's correction of something that is a "detriment to the public" or a mere "regulation" indicates that compensation should not be allowed. *DuPuy* stated, on the other hand, that proof of a "taking," or of property loss to the owner "not common to the general public," indicates that the government should pay for the owner's loss. There is perhaps no one test and no single sentence rule that can resolve the varying problems that may arise by government's interference with a property owner's full exercise of his rights.

The need to adjust the conflicts between private ownership of property and the public's interests is a very old one which has produced no single solution. Professor Jo-

seph L. Sax in his article *Takings and the Police Power*, 74 Yale L.J. 36 (1964), traces the obscure differences between police power and eminent domain as far back as Grotious, who wrote in the first quarter of the seventeenth century.[3] Professor Sax marshalls the many different tests which have been tried in the search to resolve the ancient uncertainty. Most tests have been satisfactory when applied to situations similar to the case spawning the rule, but disappointing in instances that do not fit a special mold. As already mentioned in *DuPuy*, there is good reason to deny compensation when there is no more than a regulation of a right or the prohibition of some noxious use, or when the public need outweighs the private loss.

As a test for payment to the landowner, Professor Sax points out the traditional test or rule which asks whether there has been an actual physical taking. *See* Sax, *Takings and the Police Power*, 74 Yale L.J. 36, 46–48 (1964). That test often proves unsatisfactory under our Texas constitutional provision that entitles the owner to damages when his property is taken "or damaged." The quoted words expand the owner's right to compensation and in *DuPuy* we held that "a direct physical invasion" is not required under section 17, article I, of the Texas Constitution by reason of the addition to the Constitution of 1876 of the words "damaged or destroyed." 396 S.W.2d at 108. *See also, State v. Hale*, 136 Tex. 29, 146 S.W.2d 731 (1941); *Gulf, C. & S.F.R.R. Co. v. Eddins*, 60 Tex. 656 (1884); *Allen v. City of Corpus Christi*, 247 S.W.2d 130 (Tex. Civ.App.—San Antonio 1952), *aff'd*, 152 Tex. 137, 254 S.W.2d 759 (1953). There was the case-by-case inquiry, espoused by Justice Oliver Wendell Holmes, which would measure the extent or degree of the burden upon one's property. *Accord, Coastal States Gas Producing Co. v. Pate*, 158 Tex. 171, 309 S.W.2d 828, 833 (1958); *Houston & T.C. Ry. Co. v. City of Dallas*, 98 Tex. 396, 84 S.W. 648, 653 (1905). Important in that

inquiry would be a determination whether the property was rendered "wholly useless," *Hudson County Water Co. v. McCarter*, 209 U.S. 349, 355, 28 S.Ct. 529, 52 L.Ed. 828 (1908); *Interstate Consol. St. Ry. v. Massachusetts*, 207 U.S. 79, 87, 28 S.Ct. 26, 52 L.Ed. 111 (1907), or whether the governmental burden created a disproportionate diminution in economic value or caused a "total destruction" of the value, *Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).

There is still another test which is sometimes helpful. It allows recovery of damages when the government's action against an economic interest of an owner is for its own advantage. *Morris County Land Improvement Co. v. Township of Parsippany-Troy Hills*, 40 N.J. 539, 193 A.2d 232 (1963); *Miller v. City of Beaver Falls*, 368 Pa. 189, 82 A.2d 34 (1951). *Cf. Griggs v. Allegheny County*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). A recent application of that test is found in *San Antonio River Authority v. Garrett Brothers*, 528 S.W.2d 266 (Tex. Civ.App.—San Antonio 1975, writ ref'd n. r. e.). In that case the City of San Antonio rejected plans for a proposed subdivision because the City was planning sometime in the future to acquire the land by eminent domain for a dam site and a lake or reservoir for recreation purposes. By suppressing development of the area, the City of San Antonio would keep down its costs when it exercised its powers of eminent domain. The court of civil appeals rejected the argument that the city was exercising its police powers and ruled that the government had become a participant to gain or acquire property in its own right. It was not acting as a neutral governmental arbiter to resolve conflicts between its citizens. It stated:

> The social desirability of leaving government free to seek its own enrichment at the expense of those whom it governs under the guise that it has the power to

---

**3.** A king may two ways deprive his subjects of their right, either by way of punishment or by virtue of the eminent power. But if he does it the last way, it must be for some public advantage, and then the subject ought to receive, if possible, a just satisfaction for the loss he suffers, out of the common stock. De Jure Belli et Pacis (1625), Bk. II, ch. XIV, § VII.

regulate harmful conduct is not readily apparent. See Sax, Takings and the Police Power, 74 Yale L.J. 36 (1964). To permit government, as a prospective purchaser of land, to give itself such an advantage is clearly inconsistent with the doctrine that the cost of community benefits should be distributed impartially among members of the community. 528 S.W.2d 266, 274.

*Kirschke v. City of Houston,* 330 S.W.2d 629 (Tex.Civ.App.—Houston 1959, writ ref'd n. r. e.), probably conflicts with *San Antonio River Authority v. Garrett Brothers.* While there are minor differences between the two cases, we disapprove *Kirschke.*

■ It is our opinion that the plaintiff landowners in the present case have demonstrated to both the jury and the trial court that the City of Austin by rejecting the third application for a Waterway Development Permit sought to impose a servitude upon the property to preserve "the natural and traditional character of the land and waterway"—that is, the City wanted to use plaintiffs' land as a scenic easement on the southern approach to the City of Austin. Plaintiffs did not appeal from the denial of their first two applications for a permit, but the record shows that those permits were denied pending the enactment of the new ordinance that was designed to maintain the status of land.

At the time the City denied the third application for a permit, plaintiffs lost all use of their land; the City by indirection acquired the scenic easement at no cost which it had recommended that the State Highway Department acquire by purchase. In doing so it also singled out plaintiffs to bear all of the cost for the community benefit without distributing any cost among the members of the community. *Cf. Fort Worth Improvement Dist. No. 1 v. City of Fort Worth,* 106 Tex. 148, 158 S.W. 164, 169 (1913).

The Texas legislature enacted the Highway Beautification Act in 1972, recognizing that strips of land along highways such as Interstate 35 are useful for the preservation and enhancement of scenic beauty, but there was no suggestion in the Act that lands could be taken for that purpose without payment. Tex.Rev.Civ.Stat.Ann. art. 6674v–1 provides, "The acquisition may be by gift, purchase, exchange or condemnation." There was no suggestion that government may take or hold another's property without paying for it, just because the land is pretty. Our conclusion is that the City of Austin was liable in damages to the plaintiffs.

■ Plaintiffs, having proved their right to damages, also assert that they proved damages. We hold that they did not. Plaintiffs asserted their loss of use of their land for the temporary period from June 26, 1975, the date the City denied the third application, to November 1, 1976, the date the City issued the permit in obedience to the trial court's order. They claim the loss of rentals during that period of time. Loss of rentals is an appropriate measure of damages for the temporary loss of use of land. The *Sabine & East Texas Ry. Co. v. Joachimi,* 58 Tex. 456 (1883); *Bradley v. McIntyre,* 373 S.W.2d 389 (Tex.Civ.App.—Houston 1963, writ ref'd n. r. e.); *Humble Pipe Line Co. v. Day,* 172 S.W.2d 356 (Tex. Civ.App.—Waco 1943, writ ref'd w. o. m.); *City of Tyler v. House,* 64 S.W.2d 1007 (Tex.Civ.App.—Texarkana 1933, no writ); *Gulf Pipe Line Co. v. Hurst,* 230 S.W. 1024 (Tex.Civ.App.—San Antonio 1921, no writ); *City of Paris v. Jenkins,* 122 S.W. 411 (Tex. Civ.App.1909, no writ); Annot., *Compensation for Temporary Taking,* 7 A.L.R.2d 1297 (1949). Rental value is "that amount which, in the ordinary course of business, the premises would bring or for which they could be rented, or the value, as ascertained by proof of what the premises would rent for, and not the probable profit which might accrue." 76 C.J.S. *Rental* at 1168 (1952).

Plaintiffs introduced two real estate experts who testified about the expected yield or return on lands in the neighborhood. Mr. Joe Crow, an experienced real estate man since 1940, testified that he owns land across the highway from plaintiffs' property, owns other property along Interstate 35,

has sold, developed, and is still handling other persons' property along that highway and other thoroughfares in Austin. He testified that an annual ten percent net return is "anticipated," and "is common in the business." Mr. Jim Frederick, a qualified real estate appraiser, testified that the property would yield a nine to ten percent net return on the value of the property based on his knowledge of properties near to but south of the tract in question. Neither expert testified that the raw, undeveloped land would earn anything before it was sold, rented, or developed.

Plaintiffs are not seeking lost profits, but the rule about the certainty of losses of profits is instructive also about the certainty of losses of rentals. In *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097 (1938), the rule was stated that losses must be shown by competent evidence and with reasonable certainty. It is not enough that profits merely be anticipated or hoped for; they must be established with reasonable certainty. This rule was followed in *Atomic Fuel Extraction Corp. v. Slick's Estate*, 386 S.W.2d 180 (Tex.Civ.App. —San Antonio 1964), *writ ref'd n. r. e. per curiam*, 403 S.W.2d 784 (Tex.1965). In rejecting Atomic's argument that future profits were recoverable since they were within the contemplation of both parties when the contract was signed, the court said that in those instances which have permitted recovery, there was some data and history of profits from an established business.

Anticipated rentals from land that is presently undeveloped is just as speculative and uncertain as measuring anticipated profits from a presently unestablished business. Plaintiffs testified to no kind of plan for the land. The evidence shows that plaintiffs owned the adjacent four-acre tract of land, acreage which had originally been a part of the tract now in issue. Plaintiffs obtained a permit to relocate the creek bed on that tract in August 1974. Plaintiffs testified that they had planned to erect a three-story office building on the tract, but at the time of the trial of this case in October 1976, construction had not begun and the tract was still vacant and nothing had been earned.

The plaintiffs did not prove with reasonable certainty that the unimproved tract would in reasonable certainty have produced any return at all. *San Antonio River Authority v. Garrett Brothers*, 528 S.W.2d 266, 274 (Tex.Civ.App.—San Antonio 1976, writ ref'd n. r. e.), was a case in which the plaintiff recovered damages against a municipality in a case like this one, but the damages that were allowed were the expenses which the plaintiff necessarily incurred as a result of the temporary interference with the development and use of its land. This record shows that plaintiffs suffered some damages by reason of Austin's wrongful denial of its application for a permit, but there was no proof that supports the jury finding of the value of plaintiffs' loss of use. It appears, however, that the plaintiffs sustained some actual damages in seeking and obtaining the permit to which they were entitled.

We reverse the judgments of the courts below and remand the cause to the trial court for a retrial of the damage issue.