The STATE of Texas, Appellant,

v.

BRISTOL HOTEL ASSET
CO., Appellee.

No. 04–06–00150–CV.

Court of Appeals of Texas,
San Antonio.

July 18, 2007.

Rehearing Overruled Sept. 18, 2007.

Bonnie C. Lockhart, Asst. Atty. Gen., Austin, for appellant.

John McClish, Sue Wall, Womack, McClish, Wall & Foster, P.C., Austin, for appellee.

Sitting: CATHERINE STONE, Justice, KAREN ANGELINI, Justice, STEVEN C. HILBIG, Justice.

## MEMORANDUM OPINION

Opinion by: KAREN ANGELINI, Justice.

This appeal arises out of a condemnation proceeding during which Bristol Hotel Asset Co. was awarded damages in the amount of $1,260,000.00. The State brings the following three issues on appeal: (1) the trial court should have excluded the testimony of Bristol Hotel's expert because his opinion regarding permanent damages was unreliable; (2) the trial court should have excluded Bristol Hotel's expert's testimony because his opinion regarding temporary damages was unreliable; and (3) there is legally and factually insufficient evidence to support the judgment. We affirm.

### BACKGROUND

In 1997, because of its plans to expand Loop 410 in San Antonio, the State filed for a partial taking of the hotel property owned by Bristol Hotel Asset Company ("Bristol"). In all, the State acquired 0.107 of an acre from Bristol.

The hotel in question, owned by Bristol, operates as a Holiday Inn Select ("the hotel"). It is an eleven-story, full-service hotel with 397 rooms and is located near the San Antonio airport in an area of intense commercial development. Before the taking, it had three entrance driveways: one to the west, one to the east, and one in the center. The center driveway was the primary access to the porte-cochere, which is the main entry for guests. Because the land on which the hotel was built was much higher than the frontage road on Loop 410, the main, center driveway was moderately steep. Nonetheless, it provided adequate access to the hotel and was within the City's driveway grade standards. The eastern driveway was very steep, but was required to be accessible to the fire department. The west driveway was level with the frontage road. Before the taking, the hotel was in compliance with the regulations then in effect for the Americans with Disabilities Act ("ADA").

The State's construction project required taking ten feet of land fronting the hotel's property. Because the land on which the hotel was built was much higher than the frontage road, the State's plan provided for building a ten-foot concrete and steel wall extending from the east drive to the main drive. And, as a result of the State's project and the topography of the remainder hotel property, two of the hotel's three driveways were unusable. For the hotel to continue functioning, both driveways would need complete reconstruction.

At trial, civil engineer Curtis Wilson and structural engineer June Melton testified about the modification of the entrances to the hotel. Because the taking caused the main drive to be shortened, without any modifications, the main drive would be much too steep in grade for access. Lengthening the drive and cutting down its grade to achieve an acceptable slope would create structural problems for the porte-cochere and the hotel's foundation. Additionally, the State's retaining wall blocked the view of oncoming vehicles for guests exiting the drive. Further, the State's construction project moved the exit ramp westward, causing increased merging traffic for any guests exiting. Finally, compliance with the ADA required construction of an accompanying accessible route at a regulated minimal grade. As such, because of the taking, the main drive to the hotel was permanently lost.

Under the engineer's plan, the west drive would become the primary entrance to the hotel, along which an ADA route could be built. From the west drive, a sharp turn would lead the guests up a more gradual slope to the porte-cochere. But, six parking spaces would be permanently lost. This reconstruction project of the west drive was estimated to take four months to complete. During this time, the western area of the property would be closed to all but emergency access and the only access for guests would be the east entrance.

Wilson and Melton also testified about reconstruction of the east drive. In their opinion, the drive and parking area would have to be significantly reconfigured. The drive had to be re-graded, and a short retaining wall had to constructed. The estimated time to complete the project was two months, during which time all hotel access would be through the west side of the property. As a result of this reconstruction project of the east drive, three parking spaces would be permanently lost.

At trial, David Bolton testified as Bristol's appraisal expert. Before trial, the State sought to exclude Bolton's testimony, arguing that it was unreliable. The trial court denied its motion and allowed Bolton to testify. Bolton then testified to the following damages to the hotel property as a result of the taking: $1,260,000.00 for a five percent decrease in the value of the remainder property; $509,211.00 for the cost to reconstruct the driveways; and $723,492.00 for the temporary loss of parking spaces during the reconstruction of the driveways.

The jury found that the fair market value of the hotel was $24,040,000.00 before the taking and $22,780,000.00 after the taking. Thus, the trial court entered judgment for $1,260,000.00 in favor of Bristol.

## DISCUSSION

### A.  Permanent Damages

In its first issue, the State argues that the trial court "abused its discretion in admitting the testimony of David Bolton regarding permanent damages to the remainder as cured because his opinion was based on unreliable data and there was an analytical gap between the data relied on and the conclusion reached."

■■■■ An expert witness may testify regarding "scientific, technical, or other specialized" matters if the expert is qualified and if the expert's opinion is relevant and based on a reliable foundation. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex.2006) (quoting TEX.R. EVID. 702). In considering whether expert testimony is reliable, a court should examine the principles, research, and methodology underlying an expert's conclusions. *Id.* When the testimony involves scientific knowledge, the expert's conclusions must be "grounded in the methods and procedures of science." *Id.* (quoting *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex.1995)). Otherwise, the testimony is no more than "subjective belief or unsupported speculation." *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). As such, the Texas Supreme Court has identified several non-exclusive factors that trial courts should consider when determining the reliability of expert testimony involving scientific knowledge.[1]

---

1.  These factors include the following: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique

*Id.* But, the court has also recognized that these factors may not apply when testimony is not scientific but, rather, involves technical or other specialized knowledge. *Id.* (citing *Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 726 (Tex.1998)). "Even then, however, there must be some basis for the opinion to show its reliability." *Id.* "An expert's bare opinion will not suffice." *Id.* "And, there cannot be 'too great an analytical gap between the data and the opinion proffered.'" *Id.* (quoting *Gammill*, 972 S.W.2d at 726).

In determining whether expert testimony is admissible, a trial court has broad discretion and will only be reversed for abuse of discretion. *Id.* The trial court, in determining reliability, "should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* at 579. "A significant part of the trial court's gatekeeper function is to evaluate the expert's qualifications, listen to the testimony, view the evidence, and determine which factors and evaluation methodology are most appropriate to apply." *Id.*

In a condemnation case, the central damage issue is how to measure the market value of the condemned property. *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex.2001). Market value is "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *Id.* There are three traditional approaches to determining market value: the compa-

rable sales approach, the cost approach, and the income approach. *Id.* The income approach to value is appropriate when property would, in the open market, be priced according to the income that it already generates. *Id.* at 183. By estimating this future income and applying a capitalization rate, the income approach allows the appraiser to arrive at a present value for the income-producing property. *Id.* The capitalization rate is "the rate of interest investors would require as a return on their money before they would invest in the income-producing property, taking into account all the risks involved in that particular enterprise." *Polk County v. Tenneco, Inc.*, 554 S.W.2d 918, 921 (Tex.1977).

Here, Bolton, a real-estate appraiser for forty-one years and a member of the Appraisal Institute since 1972, testified that hotel properties are priced by investors according to their income stream, especially when the hotel in question, like the hotel here, is an existing, operating property with a proven record. According to Bolton, the income approach is the most accurate in the context of a hotel property and has been called the most important hotel approach by the Appraisal Institute. Thus, in appraising the condemned hotel property, Bolton used the income approach.

Bolton described his analysis in detail. He analyzed the hotel's financial records and described his rent study of competitive, comparative hotel properties in the immediate area. Using this information, he estimated the hotel's average occupancy to be 75% and the revenue per available room, or RevPar, to be $52.50. He then multiplied this RevPar number by the number of rooms and deducted department costs to obtain gross operating in-

has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the theory or technique. *Robinson*, 923 S.W.2d at 557.

come. He then explained how he deducted certain expenses and operating costs to arrive at an estimated net operating income. He then deducted undistributed operating expenses, or the daily expenses and administration costs, to arrive at gross operating profit. From there, he deducted management fees, real estate taxes, and maintenance costs to arrive at net operating income. According to Bolton, net operating income is "the amount of money that really an investor or people [who] buy these kind of properties are really going to be interested in, how much—in order for me to receive this amount of money every year, what capital do I have to expend? What's the sales price going to be in order to receive that kind of income?" To arrive at a sales price, an investor would convert net income "into value by a rate of return" or "a capitalization rate." Bolton explained this concept with the following example and then applied the method to the facts of this case:

> If you go to the bank and buy a CD or put a savings account—or put money in a savings account, and the bank tells you they'll pay—we used to use 6 percent, but that's not a very good example anymore. But let's just use 6 percent like we used to. Then the net operating income would be 6 percent, would be out of $1000, it would be $60 that year. So just use the formula backwards. If you know the bank is paying 6 percent, and you need to make $60 a year, how much do you have to put in the bank? Well, you divide six [percent] into sixty, and that's $1000.
>
> We do the same thing here. We have the amount of money the hotel will produce. We have the rates that are required to attract investors in these kinds of properties, and that's called our capitalization rate, and ... they are obtained from various sources. In this particular case, we used a number of

sources, surveys that are done on a national and regional basis of hotels—hundreds of hotels and their financial performance, and use that as the conversion rate....

[T]here are a number of services and information that we purchase that's published monthly on performance of hotels and what they have sold for and what the return rates are all over the country. And then they also get specific to Texas and the south and other sections of the country.

Most of these kinds of investments or purchasers are national and certain regional, and they buy hotels, many times in groups. And we get to track their rates of return that they're requiring through these surveys. And in this particular case, after looking at three of these that are the prominent ones that— that people in the business not only follow these, but they're participants in those, we selected a capitalization rate of 10.5. So what we're saying here is that a hotel purchaser, or someone who would purchase this property, based on its location and financial performance, would want a ten and a half percent return.

Now remember, capitalization rate is both return on and return of. So it's more than just interest rate. So the capitalization rate also allows for the return of your capital over a period of time. So it's always going to be higher than an interest rate. But this [capitalization] rate is very sensitive to interest rates, because that's the cost of borrowing money. If I'm—if one of these major players has to borrow money, and they generally all do, to buy these hotels and ones like the subject property, [the] interest rate is going to be a very big part of the influence—or it's going to be an influence on the capitalization rate,

because that influences how much they have to pay for borrowing money, and they want to make a return above that. So in this particular case we took net income, divided by the conversion rate or capitalization rate, to indicate a value of $27,760,000.

Bolton also testified that he applied the sales comparison approach to confirm his findings. In comparing hotel properties sold near the hotel, he estimated that the hotel's market value was $27,790,000, which was close to his estimate using the income approach. He then deducted non-real estate assets, like furniture, fixtures, and equipment, to arrive at a value of $24,040,000.

The State does not contest the reliability of Bolton's valuation of the hotel before condemnation being $24,040,000. Instead, it contests the reliability of Bolton's opinion that, after condemnation, the capitalization rate should be increased from 10.5 to 11, which would decrease the value of the hotel by five percent or $1,260,000.

In arriving at a value of the hotel after condemnation, Bolton considered the changes imposed on the property that would concern an investor. According to Bolton, looking at the property before condemnation side by side with the property after condemnation, an investor would "see the different risks that are involved and the different site issues that are involved, and there is going to be a penalty for that." Bolton considered the most important impact on the property, from an investor's standpoint, to be the hotel's loss of its main entrance drive. Because of the loss of the main drive, the hotel would no longer operate as designed. Instead, a driver will have to enter from a new drive and make a hairpin 90 degree turn into the porte-cochere, which is going to cause site circulation issues. According to Bolton, this type of site circulation issue is not typical of hotels in this market. A developer would not design a hotel in that manner.

In decreasing the capitalization rate, Bolton also considered that, after condemnation, parking spaces will be permanently lost, the hotel sign will no longer be in compliance with set-back requirements,[2] and the line of sight from the remaining west drive, which will become the new main drive, will be diminished. A retaining wall will decrease the line of sight for customers exiting the west drive. This safety concern will be exacerbated by a new merge point from the freeway exit ramp, which will be moved closer to the new main drive. In Bolton's opinion, these issues would be safety concerns that an investor would consider in arriving at a fair price. According to Bolton, "[Y]ou know, it's—it's like buying a car that you know had a wreck. Yes, it looks good, but it's that resistance, because when you buy it you know you're going to have to disclose these issues to a buyer later on. And I think any buyer of this sophistication in this type of property would make some adjustment for the issues that remain." According to Bolton, the hotel would not be functioning as designed and, as a result, an investor would rate the hotel inferior to the hotel as it existed before the taking. Given these impacts to the hotel as a result of the taking, Bolton testified that an investor buying the hotel would attribute a greater risk to the asset and would thereby penalize its value by raising the capitalization rate fifty basis

2. The State argues that this non-compliant sign is irrelevant because it would be "grandfathered." However, Bolton pointed out that when the sign has to be replaced, the new sign would not be "grandfathered." Thus, according to Bolton, an investor would consider the noncompliance of the sign in any sales price for the hotel.

points, or half a percent. In applying capitalization rates, Bolton testified that he consulted industry surveys that contain specific financial information and capitalization rates of hotels across the state, region, and nation.

The State criticizes the reliability of Bolton's testimony, emphasizing that in concluding that these issues were safety concerns, Bolton relied on Curtis Wilson's work. However, according to the State, Curtis Wilson disputed Bolton's testimony, testifying that the reconfigured driveways were not safety concerns. As such, the State argues that there is no support for Bolton's conclusion that the property diminished five percent.

However, in reviewing the record, Wilson did not dispute Bolton's assertion that the new drive would create a safety issue that did not exist before condemnation. The State makes much of Wilson testifying that his redesign of the driveways would be safer than the driveways that existed before the condemnation. However, while Wilson testified that the driveways would not be as steep as the ones that existed before, he did not testify that his reconfigured plan was more desirable than the hotel's original design. In fact, Wilson testified that because the State is planning to build a ten-foot retaining wall that extends the front of the hotel property, a driver exiting the hotel's drive "will be looking right into the wall" and will have a diminished sight line. Thus, although the sight line should be "sufficient," "obviously it's a safety concern with people entering and exiting the driveway." And, when asked whether, despite his best efforts, he could "make the hotel property as good as it was before," Wilson replied, "No. I don't believe it will be as good as it was before, because it doesn't have the—accessibility that it had in the beginning." We, therefore, find no support for the assertion that

Bolton improperly relied on Wilson's conclusions.

■ We, therefore, hold that the trial court did not abuse its discretion in allowing Bolton to testify about permanent damages.

### B. Temporary Damages

■ In its second issue, the State argues that the "trial court abused its discretion in admitting the testimony of David Bolton regarding temporary damages to the remainder as cured because his opinion was based on unreliable data and there was an analytical gap between the data relied upon and the conclusion reached."

Because of the taking, the hotel's driveways have to be reconfigured in two phases. In the first phase, a large area of the eastern parking will be unusable and the east drive will be rebuilt, including drilling piers for support, constructing a concrete retaining wall, and installing storm water drainage appurtenances. For two months, forty-three parking spaces will be closed and unusable by the hotel. After this first phase is complete, the second stage will begin, requiring an even larger area on the west side of the hotel. The main drive will be permanently closed. A new ADA accessible drive will be created, which will require regrading of the land. The porte-cochere will have to be stabilized, and drilled piers will be installed. And, the western parking lot will be rebuilt. For four months, eighty parking spaces will be closed and unusable, and the western area of the hotel will be closed to all but emergency access.

Bolton appraised the impact of this on-site construction by considering the temporary loss of large portions of the hotel during reconstruction and the hard costs of the project. Bolton testified that parking is an "integral part of the business of

this real estate, this hotel." According to Bolton, parking is so important to the hotel that it would not willingly lease spaces to another party. "But hypothetically, or if [the hotel] would, certainly [it] would not—[it] would lease [the parking spaces] for no less than the amount of income that was being produced on a per unit basis for these 80 units, or 80 spaces and 43 spaces. That's the way I've approached it." Thus, using the income approach, after accounting for vacancy and variable expenses, Bolton allocated net income produced by the hotel on a monthly basis to the number of lost parking spaces for the number of months of reconstruction. Using this method, Bolton calculated temporary damages in the amount of $723,492.

First, the State argues that Bolton's calculation of temporary damages resulting from this reconfiguration in the amount of $723,492 was unreliable because his analysis assumed the hotel would need one space for every room rented when, in fact, the hotel operated with 397 rooms and 380 parking spaces. According to the State, the hotel had on average 75% occupancy. Thus, even during the reconfiguration, it would need only 298 parking spaces.[3] And, during the four months of the construction period, the hotel would have 300 parking spaces available. Thus, the State argues that the hotel had plenty of parking even during the reconstruction and that Bolton was wrong to find any damages at all for loss of parking spaces.

The State's analysis, however, is overly simplistic. As Bolton testified, the hotel's occupancy is 75% *on average.* Thus, according to Bolton, certain nights during the week (when a convention would, for example, be booked at the hotel), the hotel might have 100% occupancy and thus not have sufficient parking spaces. On the other hand, during the weekend, the hotel might only have 40% occupancy and have plenty of extra spaces. Bolton testified that the State's analysis does not apply to how a hotel operates: "If you just do it on an average, then that would mean that you would have to have only 75 percent every night. And that's not the way the hotel works." Thus, we do not find the State's argument persuasive.

Second, the State argues that Bolton's testimony is unreliable because it failed to follow "any acceptable appraisal methodology for determining such lease or rental rate." For support, the State cites *City of Austin v. Teague,* 570 S.W.2d 389 (Tex. 1978), which it argues disapproved of using "probable profit which might accrue as a measure of damages." In *Teague,* a landowner bulldozed the brush, trees, and other vegetation on his property to prepare it for commercial development. *Id.* at 390. Local residents then appeared before the Austin City Council and asked it to stop further development and take steps to preserve the land as a scenic easement bordering the southern approach to downtown Austin. *Id.* The council responded by adopting a resolution requiring the Texas Highway Department to study the feasibility of acquiring the land as a scenic easement. *Id.* In the meantime, the Planning Commission denied the landowner permits needed to develop the land. *Id.* The court held that the City's actions were a temporary taking for which the City was liable, noting that there was no suggestion in the Highway Beautification Act that "government may take or hold another's property without paying for it, just because the land is pretty." *Id.* at 394.

---

3. 397 multiplied by 75% equals 297.75. Thus, the State argues that for its 397 rooms, the hotel would only need 298 parking spaces.

In calculating his damages as a result of the taking, the landowner claimed loss of rental during the period of time in question. *Id.* The supreme court explained that "[l]oss of rentals is an appropriate measure of damages for the temporary loss of use of land." *Id.* And, it defined rental value as "that amount which, in the ordinary course of business, the premises would bring or for which they could be rented, or the value, as ascertained by proof of what the premises would rent for, and not the probable profit which might accrue." *Id.* The court, however, found that the landowner had not shown loss of rentals, but instead had proved loss of probable profit. *Id.* at 395. The landowner's real estate experts testified about the expected yield or return on lands in the neighborhood. One expert testified that an annual ten percent net return is "anticipated" and "is common in the business." *Id.* The other expert testified that based on his knowledge and experience, the property would yield a nine to ten percent net return on the value of the property. *Id.* Neither expert testified that the raw, undeveloped land would earn anything before it was sold, rented, or developed. *Id.* The court reasoned that "[a]nticipated rentals from land that is presently undeveloped is just as speculative and uncertain as measuring anticipated profits from an unestablished business." *Id.* The court concluded that the landowner did not prove with reasonable certainty that the unimproved tract would in reasonable certainty have produced any return at all. *Id.* Thus, the court reversed and remanded on the damages issue. *Id.*

*Teague* is distinguishable from the facts here. The hotel is not an undeveloped piece of land with no income history, and Bolton did not testify about "probable profit." Instead, Bolton calculated the net operating income based on the hotel's income history and, accounting for average occupancy, determined income per parking space. *See State v. Target Corp.,* 194 S.W.3d 46, 51 n. 5 (Tex.App.-Waco 2006, no pet. h.) (explaining that the trial court did not abuse its discretion in allowing expert to testify, in a condemnation case, about his conclusions regarding the landowner's loss in net operating income per lost parking space because the expert's methodology in considering average income per space over the course of the year was reliable). Therefore, the holding in *Teague* does not control here.

Third, the State argues that Texas case law provides for temporary loss of revenues in limited circumstances and that this case does not fall under those limited circumstances. Relying on *City of Austin v. Avenue Corp.,* 704 S.W.2d 11, 13 (Tex. 1986), the State argues that to recover temporary loss of revenue, a material and substantial interference with access to one's property must be shown by demonstrating (1) a total but temporary restriction of access, (2) a partial but permanent restriction of access, or (3) a temporary limited restriction of access brought by an illegal activity or one that is negligently performed or unduly delayed. According to the State, Bristol made no showing that any of these conditions exist here and, in fact, Wilson testified that the hotel would have driveway access at all times during reconstruction. As such, the State argues that Bristol is not entitled to recover temporary damages as a matter of law.

Bristol, however, points out that *City of Austin* is distinguishable from the facts here. In *City of Austin,* the city reconstructed a street and sidewalk in front of a restaurant. *Id.* at 12. Because of the construction, for nine months, access to the restaurant was partially restricted. *Id.* The supreme court explained that the dispositive issue was whether a partial temporary restriction of access to a per-

son's property by a governmental unit gives rise to inverse condemnation. *Id.* The court held that the restaurant operator could not recover lost profits resulting from the placement of temporary obstructions in the street in front of his business absent a showing that the placement of the obstruction was unreasonable or unnecessary. *Id.* According to the court, "[t]he inconvenience and damage which a property owner suffers from these temporary obstructions are incident to city life and must be endured." *Id.* Thus, the court reasoned that the law did not give the restaurant owner a right to relief because "he recoups his damage in the benefit which he shares with the general public in the ultimate improvement which is being made." *Id.* However, the law "does afford him relief, if the city or a contractor interferes with the highway without authority; or, if acting legally, prolongs the work unnecessarily or unreasonably." *Id.* at 12–13. Therefore, the supreme court held that in order to show a material and substantial interference with access to one's property, one must show that there has been (1) a total but temporary restriction of access; (2) a partial but permanent restriction of access; or (3) a temporary limited restriction of access brought about by an illegal activity or one that is negligently performed or unduly delayed. *Id.* at 13.

■ Here, however, we are not dealing with an inverse condemnation suit where the City, during construction, obstructed access to a business by placing barriers on public property. Bristol is not seeking compensation because obstructions placed by the governmental unit restricted access to its property. Bristol is seeking compensation for damages *incurred on its own remainder property.* And, damages sustained by a landowner that result from remainder property modifications required

as a result of the taking are compensable. *State v. Centennial Mortgage Corp.,* 867 S.W.2d 783, 784 (Tex.1993). As such, the holding in *City of Austin* does not apply to the facts here.

We hold that the trial court did not abuse its discretion in allowing Bolton to testify about temporary damages.

## C. Question No. 2

■ In its third issue, the State argues that the "trial court erred in denying the State's motion to exclude David Bolton's testimony because there was no evidence, or in the alternative, insufficient evidence to support the jury's answers to Question No. 2." Question No. 2 asked the jury to determine the fair market value of the remaining property, as improved, after the taking, "considering the uses to which the part taken is to be subjected." The State argues that without Bolton's testimony, there is no evidence or factually insufficient evidence to support this finding by the jury. However, we have held that the trial court did not abuse its discretion in allowing Bolton's testimony. Therefore, his testimony does support the jury's finding to Question No. 2. As such, the evidence is both legally and factually sufficient.

### CONCLUSION

We affirm the judgment of the trial court.