

# KEN PAXTON
### ATTORNEY GENERAL OF TEXAS

February 22, 2017

The Honorable J.D. Sheffield
Chair, Joint Committee on Aging
Texas House of Representatives
Post Office Box 2910
Austin, Texas 78768-2910

Opinion No. KP-0133

Re: Whether the proposed Upper San Saba River Management Plan unlawfully delegates legislative power to a private entity (RQ-0124-KP)

Dear Representative Sheffield:

You ask about the constitutionality of a management plan (the "Plan") for the upper San Saba River proposed by a group of water rights holders and others.[1] According to its terms, the Plan's primary purpose would be to "provid[e] flows downstream of Menard County in the summer months during times of drought, while minimizing, to the extent possible . . . negative impact on upstream users." Attachment at 2. To achieve this, the Plan would create a board that the Legislature would authorize to issue orders to curtail the use of water when certain conditions are met. See id. at 3–7. The members of the board would include private landowners and other specific persons appointed by each of the county judges in the affected counties, as well as "[a] representative from [the Texas Commission on Environmental Quality], a hydrologist, and all groundwater and/or underground water district managers in the four-county management area." Id. at 3.[2] Your concerns arise from whether "the Legislature empowering a 'private board' to regulate all diversions from the Upper San Saba River" is an improper delegation of authority. Request Letter at 3.[3] Specifically, you ask whether "the adoption of the Plan, and legislative action

---

[1] See Letter and Attachment from Honorable J.D. Sheffield, Chair, Joint Comm. on Aging, Tex. House of Reps., to Honorable Ken Paxton, Tex. Att'y Gen. at 1 (received Aug. 26, 2016), https://www.texasattorneygeneral.gov/opinion/requests-for-opinion-rqs ("Request Letter" and "Attachment" respectively) (Attachment on file with the Op. Comm.).

[2] According to the Plan you submitted, the Schleicher County Judge would appoint "[two] groundwater irrigators from eastern Schleicher County"; the Menard County Judge would appoint "[one] member of [the] Menard Irrigation Company Board of Directors, [one] landowner with adjudicated rights[, and the] manager of Menard County Water Control and Improvement District No. 1"; the Mason County Judge would appoint "[two] landowners with riparian [domestic and livestock] rights"; and the McCulloch County Judge would appoint "[two] landowners with adjudicated water rights and/or riparian [domestic and livestock] rights." Attachment at 3.

[3] You do not ask, and we do not opine on, whether the board in question is, in fact, a private entity for purposes of delegation analysis. But "courts have universally treated a delegation as private where interested groups have been

to incorporate the same by statute [would] constitute an unconstitutional delegation of legislative and executive authority infringing on the separation of powers." *Id.* at 1. You also ask whether the Plan would "effect a taking of constitutionally and statutorily protected rights of riparian landowners along the Upper San Saba River segment to the flows in the river." *Id.*

At the outset, we note our receipt of briefing informing us that the Plan has been updated in response to concerns expressed at public meetings and is not finalized.[4] According to the updated version of the Plan as submitted to this office ("Updated Plan"), the Commission would delegate its authority not to a private entity but to a board which the Legislature would designate as "a local governmental entity and agent of the [Commission]."[5] Brief Enclosure at 2. Assessing the constitutionality of a plan that is in a state of flux creates inherent difficulty, and you have asked about only the earlier version of the Plan. Whether a particular waterway management plan involves an improper delegation of authority or results in an unconstitutional taking will likely involve multiple factual inquiries that cannot be resolved in an attorney general opinion. *See* Tex. Att'y Gen. Op. No. KP-0099 (2016) at 3 (noting that abstract factual determinations are "not appropriate for the opinion process"). However, we can offer general guidance regarding the delegation of legislative power as it exists in both Plans and the analysis courts use to assess a takings claim.

We begin with the delegation of legislative power. "The Texas Constitution vests 'legislative power' in the Legislature." *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 873 (Tex. 2000) (quoting TEX. CONST. art. III, § 1) (creating the legislative department); *see also* TEX. CONST. art. II, § 1 (establishing separation of powers among the legislative, executive, and judicial departments). Legislative power, which the courts define broadly, "includes the power to set public policy. In addition, it includes many functions that have administrative aspects, including the power to provide the details of the law, to promulgate rules and regulations to apply the law, and to ascertain conditions upon which existing laws may operate." *FM Props.*, 22 S.W.3d at 873 (citations omitted). The Texas Supreme Court has long recognized that "because a legislative body would be hard pressed to contend with every detail involved in carrying out applicable laws, delegation of some legislative power is both necessary and proper." *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 654 (Tex. 2004); *see also* *FM Props.*, 22 S.W.3d at 873; *Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 466 (Tex. 1997). "Thus, the Legislature may delegate legislative power to local governments, administrative agencies, and even private entities under certain conditions." *FM Props.*, 22 S.W.3d at 873. Any such delegation "must be exercised with a certain amount of caution." *Patient Advocates*, 136 S.W.3d at 654. If the Legislature delegates its authority to a private entity, the delegation will be "subject to more stringent requirements and less judicial deference" than a

---

given authoritative powers of determination, usually in conjunction with a public administrative agency." *Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 470–71 (Tex. 1997) (quotation marks omitted).

[4]*See* Brief and Enclosure from Honorable Richard Cordes, Menard Cty. Judge (Sept. 21, 2016) ("Brief" and "Brief Enclosure," respectively) (on file with the Op. Comm.).

[5]The makeup of the board under the Updated Plan would differ from the original Plan only in that the Menard County Judge would appoint "[t]wo landowners with adjudicated rights or riparian [domestic and livestock] users." Brief Enclosure at 3.

public delegation, given that it raises "more troubling constitutional issues." *FM Props.*, 22 S.W.3d at 874 (explaining the difficulties that arise when private delegates "are not elected by the people, appointed by a public official or entity, or employed by the government").

In examining a private delegation, as contemplated in the original Plan, the Texas Supreme Court applies the same analysis whether the delegation is made directly by the Legislature or through an administrative agency. *See Patient Advocates*, 136 S.W.3d at 653–54. In either instance, a court must first determine whether "in fact a delegation of power" to a private entity has taken place. *Id.* at 654. In Texas, water and water rights are generally within the jurisdiction of the Texas Commission on Environmental Quality (the "Commission'), including "water rights adjudication, cancellation of water rights, and enforcement of water rights." TEX. WATER CODE § 5.013(a)(1). In particular, "[d]uring a period of drought or other emergency shortage of water," the executive director of the Commission may issue an order to "(1) temporarily suspend the right of any person who holds a water right to use the water; and (2) temporarily adjust the diversions of water by water rights holders." *Id.* § 11.053(a). To implement this authority, the Commission

> shall adopt rules . . . (1) defining a drought or other emergency shortage of water for purposes of [section 11.053]; and (2) specifying the: (A) conditions under which the executive director may issue an order under this section; (B) terms of an order issued under this section, including the maximum duration of a temporary suspension or adjustment under this section; and (C) procedures for notice of, an opportunity for a hearing on, and the appeal to the commission of an order issued under this section.

*Id.* § 11.053(c). A court examining the Plan and any implementing legislation to determine whether a private delegation has taken place would thus consider whether the Commission retains this statutory authority or whether the Plan instead permits the private entity to set public policy, provide the details of the law, "promulgate rules and regulations to apply the law, [or] ascertain conditions upon which existing laws may operate." *See FM Props.*, 22 S.W.3d at 873. If a court concluded that a private delegation exists, it would then examine the constitutionality of such a delegation, bearing in mind that "courts should, when possible, read delegations narrowly to uphold their validity." *Tex. Boll Weevil*, 952 S.W.2d at 475.

Generally, "the Legislature may delegate its powers to private entities if the legislative purpose is discernable and there is protection against the arbitrary exercise of power." *Patient Advocates*, 136 S.W.3d at 654 (quotation marks omitted). To apply a "more searching scrutiny" to such a private delegation, the Texas Supreme Court uses an eight-factor test it established to weigh the constitutionality of a private delegation. *Id.* (referring to the test as established in *Boll Weevil*). Under that test, the Court asks:

1. Are the private delegate's actions subject to meaningful review by a state agency or other branch of state government?

2. Are the persons affected by the private delegate's actions adequately represented in the decisionmaking process?

3. Is the private delegate's power limited to making rules, or does the delegate also apply the law to particular individuals?

4. Does the private delegate have a pecuniary or other personal interest that may conflict with its public function?

5. Is the private delegate empowered to define criminal acts or impose criminal sanctions?

6. Is the delegation narrow in duration, extent, and subject matter?

7. Does the private delegate possess special qualifications or training for the task delegated to it?

8. Has the Legislature provided sufficient standards to guide the private delegate in its work?

*FM Props.*, 22 S.W.3d at 874; *see also Tex. Boll Weevil*, 952 S.W.2d at 472 (emphasizing that "these standards apply only to private delegations, not to the usual delegation by the Legislature to an agency or another department of government"). As a general rule, no single factor weighs more heavily than another, "but the importance of each factor will necessarily differ in each case." *FM Props.*, 22 S.W.3d at 875, 888 (considering the weight of the *Boll Weevil* factors "as a whole"); *see also Tex. Boll Weevil,* 952 S.W.2d at 475 (noting that private delegations do not have to satisfy all eight factors in order to be upheld as constitutional). In the case of a statute delegating legislative power to "private interested parties," the Texas Supreme Court gives more weight to the first and fourth factors. *See FM Props.*, 22 S.W.3d. at 875.

Given the preliminary status of the original Plan you have submitted, we are unable to make definitive conclusions as to the constitutionality of the delegation. Yet we can make the following observations in light of the Court's *Boll Weevil* factors. We begin with the first and fourth factors, which consider meaningful review and conflict of interest, respectively. *Id.* at 874. Under the Plan, each water user has "the right to review board evaluations" and decisions to curtail usage by requesting an appeal to the Commission. Attachment at 8. General complaints to the board may also be appealed to the Commission. *Id.* A landowner's refusal to comply with a board order requiring water usage curtailment also "shall be referred to" the Commission, which "will investigate Board findings" and resolve the dispute. *Id.* Thus, at least some of the board's actions are subject to meaningful review by a state agency, which would weigh in favor of constitutionality. But it appears that at least some of the members of the board would have a pecuniary interest in the decisions of the board, making the fourth factor weigh against constitutionality.

Considering the remaining factors, some weigh in favor of finding the Plan constitutional. For example, under the fifth factor (empowerment to define criminal acts or impose sanctions), the Plan does not provide the board with authority to define criminal acts or impose criminal sanctions. Considering the seventh factor (special qualifications or training), the Plan requires that the board include a "representative from [the Commission], a hydrologist, and all groundwater and/or underground water district managers in the four-county management area," suggesting that

at least some members must possess special qualifications or training for the tasks delegated to the board. *Id.* at 3.

On the other hand, certain factors weigh against constitutionality, such as the third (scope of power) and sixth (how narrow the delegation is in duration, extent, and subject matter). Specifically, the board has the authority to issue an order curtailing water usage, so the board would apply the law to particular individuals and would not merely make rules. And while the Plan creates term limits for the individual board members, it would not limit the overall duration of the board's authority.

Still other factors, such as the second (adequate representation of those affected) and eighth (sufficiency of legislatively-provided guidance), are unknown, and thus we do not have sufficient information to determine in which direction those factors weigh. A court examining the original Plan and any implementing legislation, using the guiding principle that "[t]he nondelegation doctrine should be used sparingly," would analyze all of the facts presented and determine whether the *Boll Weevil* factors as a whole weigh in favor of or against constitutionality. *Tex. Boll Weevil*, 952 S.W.2d at 475.

If a delegation of legislative authority is instead to another governmental entity, as in the Updated Plan, the Texas Supreme Court uses a much less stringent standard, focusing simply on whether the Legislature "establish[ed] reasonable standards to guide" the public entity in exercising such powers. *Patient Advocates*, 136 S.W.3d at 654; *see also Tex. Boll Weevil*, 952 S.W.2d at 467. A court would thus analyze any legislation implementing a public delegation accordingly.

We turn to the issue of a potential taking. You refer to the Plan's guidelines for water curtailment, which are set according to the river flow measured at the gauge in Menard. *See* Request Letter at 4; Attachment at 4. You suggest that because the gauge "is located above (i.e., upstream from)" certain allegedly illegal diversions of state water, the Plan allows certain users to take "as much water as they want" while downstream domestic and livestock users in effect "surrender involuntarily their constitutional priority . . . without recourse or due compensation." Request Letter at 4–5.

Article I, section 17(a) of the Texas Constitution provides in pertinent part that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made." TEX. CONST. art. I, § 17. In construing this provision, the Texas Supreme Court has "generally been guided by the United States Supreme Court's construction and application of the similar guarantee provided by the Fifth Amendment to the United States Constitution." *Edwards Aquifer Auth. v. Day*, 369 S.W.3d 814, 838 (Tex. 2012). The first factor in that federal framework is "the economic impact of the regulation on the claimant." *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 477 (Tex. 2012). "The second factor . . . is the character of the governmental action." *Id.* at 477–78; *see also Edwards Aquifer*, 369 S.W.3d at 839 ("for instance, whether [the regulation] amounts to a physical invasion or instead merely affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good" (quotation marks omitted)). The third consideration is "the extent to which the regulation has interfered with the economic expectations

of the property owner." *Hearts Bluff*, 381 S.W.3d at 478. "[W]hether a particular property restriction is a taking depends largely on 'upon the particular circumstances [in that] case.'" *Id.* at 477 (quoting *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978)). A court considering such circumstances in light of this federal framework must take into account the surrounding circumstances and apply "a fact-sensitive test of reasonableness, but in the end, whether the facts are sufficient to constitute a taking is a question of law." *Edwards Aquifer*, 369 S.W.3d at 839 (quotation marks omitted) (noting that the federal inquiry "focuses directly upon the severity of the burden that government imposes upon private property rights"); *see also Sheffield Dev. Co., Inc. v. City of Glenn Heights*, 140 S.W.3d 660, 671 & n.52 (Tex. 2004) (acknowledging the contentious and perplexing nature of takings cases and characterizing them as "a sophistic Miltonian Serbonian Bog" where "armies whole have sunk") (quoting *City of Austin v. Teague*, 570 S.W.2d 389, 391 (Tex. 1978) and JOHN MILTON, PARADISE LOST 49, bk. II, ll. 592–94 (Scott Elledge ed., Norton & Co. 1993) (1674)). Given the unique nature of each landowner's property rights and other unknown factors, we are unable to offer general observations about how a court might apply the federal framework to individual facts.

## S U M M A R Y

The constitutionality of a proposed management plan (the "Plan") for the Upper San Saba River involving a potential delegation of legislative authority, and whether such a Plan would result in a regulatory taking, involves fact determinations that cannot be resolved in an attorney general opinion.

If the Plan involves a delegation of legislative authority to a private entity, a court would first confirm the delegation, examining whether the Plan results in a private entity setting public policy, providing the details of the law, promulgating rules and regulations to apply the law, or ascertaining conditions upon which existing laws may operate. If so, the court would apply the eight-factor test established in *Texas Boll Weevil Eradication Foundation, Inc. v. Lewellen* to determine whether the factors as a whole weigh in favor of or against constitutionality. If the Plan involves a delegation of legislative authority to a public entity, a court examines whether the Legislature established reasonable standards to guide the public entity in exercising such powers.

A court considering a regulatory takings challenge would use a federal framework examining: (1) "the economic impact of the regulation on the claimant"; (2) the "character of the governmental action"; and (3) the "extent to which the regulation has interfered with the economic expectations of the property owner."

Very truly yours,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

VIRGINIA K. HOELSCHER
Chair, Opinion Committee

BECKY P. CASARES
Assistant Attorney General, Opinion Committee